NOTICE

Decision filed 03/06/06. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

NO. 5-04-0548

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | |
|---|---|
| LORRAINE TURNER, | ) Appeal from the |
| | ) Circuit Court of |
| Plaintiff-Appellee, | ) Madison County. |
| | ) |
| v. | ) No. 02-L-357 |
| | ) |
| FIRSTAR BANK, N.A., | ) |
| | ) |
| Defendant-Appellant, | ) |
| | ) |
| and | ) |
| | ) |
| SHAMROCK RECOVERY SERVICE, INC., | ) Honorable |
| | ) Ralph J. Mendelsohn, |
| Defendant. | ) Judge, presiding. |

_____

PRESIDING JUSTICE SPOMER delivered the opinion of the court:

The due process clause of the fourteenth amendment to the United States Constitution prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor. *State Farm Mutual Automobile Insurance Co. v. Campbell*, 538 U.S. 408, 416, 155 L. Ed. 2d 585, 600, 123 S. Ct. 1513, 1519-20 (2003). This is because elementary notions of fairness enshrined in our nation's constitutional jurisprudence dictate that a person or corporation receive fair notice not only of the conduct that will subject that person or corporation to punishment but also of the severity of the penalty that may be imposed. *Campbell*, 538 U.S. at 417, 155 L. Ed. 2d at 600, 123 S. Ct. at 1520.

In the case at bar, defendant Firstar Bank, N.A. (the defendant), appeals an order of the circuit court of Madison County entering a judgment on a jury verdict against the defendant in the amount of $500,000 in punitive damages. For the reasons that follow, we

1

affirm the circuit court's judgment as modified, and we remand for a remittitur to reduce the judgment to $225,000 or for a new trial on the issue of the amount of punitive damages.

In 1994, the defendant's predecessor, Central Bank, extended a car loan to the plaintiff. Central Bank was acquired by Mercantile Bank, which was in turn acquired by the defendant. Soon after these mergers, a dispute arose between the plaintiff and the defendant concerning the currency of the loan and the balance remaining on it. Details of the dispute, and the attempts made to resolve it, will be discussed below. On March 1, 2000, the plaintiff received the title to her car, along with written confirmation that her loan was paid in full. On Saturday, March 11, 2000, the plaintiff planned to take photographs at an extracurricular event sponsored by the school district by which she was employed. Upon exiting her home, the plaintiff discovered that her car was missing. She immediately contacted local police officials to report the theft of her car. After a brief investigation, the police informed the plaintiff that her car had been seized by Shamrock Recovery Service, Inc. (Shamrock), a defendant below but not a party to this appeal, acting upon orders of the defendant. Shamrock advised the police that the repossession had resulted from the plaintiff's default upon her loan. The plaintiff showed the police her original vehicle title, which recited that the defendant's security interest had been "released and discharged," as well as a letter from the defendant confirming the "paid in full" status of her loan. Although the police conveyed this documentation to Shamrock on Sunday, March 12, 2000, Shamrock refused to release the car, and the police declined further involvement in the matter, advising the plaintiff to contact an attorney to resolve the matter.

On Monday, March 13, 2000, the first day following the repossession during which the defendant could be contacted, the plaintiff took a personal day off from her job, borrowed her elderly mother's car, and drove to the local branch of the defendant. She had not yet contacted an attorney, believing at the time that it would not be necessary to do so. At the

branch, she again displayed the documentation confirming the payment of her loan and the release of the defendant's lien, and she renewed her request for her car. The branch manager checked his computer records, made some phone calls, and then declined to intervene, claiming that according to the defendant the plaintiff still owed approximately $300 on the loan.

Later on the afternoon of March 13, 2000, the plaintiff enlisted the aid of attorney Leonard Berg to help her recover her car. Berg spent three hours speaking to representatives of the defendant in three different states and ultimately succeeded in convincing the defendant to release the plaintiff's car. However, the defendant was unwilling to deliver the car back to the plaintiff. The plaintiff was required to retrieve the car herself from an impound lot in a neighboring town. In a memorandum to Shamrock, the defendant confirmed that the plaintiff's loan had been paid off before the repossession, and it instructed Shamrock to release the car to the plaintiff. The plaintiff's elderly mother drove her to the impound lot to pick up her car. When the plaintiff looked in her car, she saw that personal belongings she had left in the car were missing. Although some of the belongings had been stuffed in a box and placed in the trunk of the car, the plaintiff's laptop computer, several discs containing computer software, and a digital camera belonging to the plaintiff's employer—to be used by the plaintiff to take photographs at the event she was going to when she discovered that her car had been taken—were missing. The individual at the impound lot denied knowledge of the missing items.

After making sure her mother returned home safely from the impound lot, the plaintiff went to the local police to report as stolen the missing contents of her car. The police again declined involvement, and the plaintiff turned to attorney Berg to help her try to recover the missing items. For the next two years, prior to the plaintiff's filing suit in this case, Berg attempted to secure the return of the items, making repeated phone calls to the defendant and

3

sending six letters to it. The defendant made no substantive response to the plaintiff's inquiries and demands.

The plaintiff filed suit against the defendant and Shamrock approximately two years after the repossession, seeking compensatory and punitive damages from both defendants for the conversion of her car and the personal belongings. On May 9, 2002, the plaintiff obtained a default against both defendants. After a prove-up, the trial court assessed $25,000 in compensatory damages and $25,000 in punitive damages. The court entered a judgment in favor of the plaintiff and against both defendants "jointly and severally" and ordered that enforcement could issue. The defendant subsequently filed a motion to vacate the judgment against it, which was granted. The plaintiff executed on the judgment against Shamrock and filed citations to discover its assets. By January 15, 2005, Shamrock had paid the judgment entered against it, and the plaintiff signed a satisfaction of judgment. Meanwhile, the plaintiff proceeded to a trial to seek an award of punitive damages against the defendant.

Testimony began on April 6, 2004. The first witness to testify in the plaintiff's case in chief was Michael Haywood, a former employee of the defendant. Haywood had worked in the loan operation department doing collections, dispute resolution, foreclosures, and repossessions, and he had personally handled the plaintiff's account for the defendant. Haywood testified that he was present under subpoena. With regard to the payment dispute between the plaintiff and the defendant, Haywood testified to a payment-processing-and-collection system that was, at best, imprecise. Haywood testified that none of the collection notices he sent to the plaintiff could be reconciled with one another and that, based upon one of them, the plaintiff had actually overpaid the loan. He attributed the errors in the notices to unreliable data in the computer system, which in turn was attributable, *inter alia*, to a processing system wherein bank personnel consistently failed to retrieve payments from facilities where customers had sent the payments and wherein those facilities were sometimes

4

closed without informing customers and notifying them where to send future payments.

Haywood also testified that computer system coding problems prevented tellers from identifying the correct account to which a payment should be applied and that payments were sometimes lost and never credited to any account. According to Haywood, given the sheer number of accounts he was assigned to handle, he could not verify the accuracy of debts before proceeding with collection; only when a customer called in to dispute a debt was he allowed to go back and try to piece together what had happened to the customer's account. Haywood testified that employees like himself in the collections department were also not told when payment facilities were closed and that "[i]t was only through trial and error" that collections department employees discovered that payments had been made but not accurately applied to customer accounts. Haywood testified that management was aware of the ongoing problems. He testified that when a wrongful repossession occurred, if customers were able to bring in documentation to prove that the defendant had erred, the wrongfully repossessed vehicles were then returned to the customers. Although Haywood could not testify to a precise number, he did testify that multiple wrongful repossessions had occurred during the year preceding the wrongful repossession of the plaintiff's car.

Based on the foregoing system-wide problems, Haywood testified that there was only a 50% probability that the data he relied upon concerning the plaintiff's account was accurate. Nevertheless, although Haywood knew that the plaintiff disputed she owed a debt on her account and although he knew that his data was unreliable, Haywood proceeded with the repossession against the plaintiff without first attempting to verify the data he had received from his computer system. On cross-examination, Haywood denied that he had been laid off by the defendant, testifying instead that he had "quit." On redirect examination, Haywood testified that members of management called his attention to system problems, rather than vice versa, and that his supervisor had reviewed the figures regarding the plaintiff's account

5

with him and had also signed off on the repossession. On re-cross-examination, Haywood testified that his supervisor's manager had also signed off on the repossession. No evidence was offered by the defendant to contradict Haywood's depiction of the events in question or of the workloads, operating procedures, or management practices of the defendant's organization.

The next witness to testify in the plaintiff's case in chief was Gene Tudor, an employee of the defendant who was present as the corporate representative of the defendant and who managed the defendant's repossession department. Tudor was called by the plaintiff as an adverse witness under section 2-1102 of the Code of Civil Procedure (735 ILCS 5/2-1102 (West 2004)). Tudor testified that the plaintiff's car never should have been repossessed on March 11, 2000, that the defendant had no right to repossess the plaintiff's car on that date, and that, in fact, the repossession was illegal. He also testified that he had no reason to dispute the plaintiff's claim against the defendant. Tudor read an excerpt from the defendant's promissory note with the plaintiff that stated that if the defendant repossessed the collateral under the note, the defendant would make "reasonable efforts" to return any contents found in the collateral to the plaintiff. When asked what efforts the defendant had made to return the items missing from the plaintiff's car to her, Tudor testified that to the best of his knowledge, the plaintiff had been "directed directly to the recovery place." Tudor reiterated testimony given in an earlier deposition that the missing items were "irrelevant to the bank" because the bank had a hold-harmless agreement with the repossession companies that acted on the defendant's behalf. Tudor insisted that all liability for the missing items lay with the repossession company, even though, in Tudor's own words, "[t]hey were an agent of the bank" and "[t]hey are told to do what is legally in the best interest of the bank." Tudor later conceded that the defendant "should have" contacted the repossession company and attempted to find out what had happened to the plaintiff's items but that in the four years

6

between the wrongful repossession and the trial, the defendant had never made contact with the repossession company regarding the issue.

When asked if the wrongful repossession could have been avoided had anyone in the defendant's organization verified where the plaintiff's title was on March 11, 2000, Tudor first testified that "[w]ith [his] workload that would have been impossible" and then conceded that such a check would have prevented the wrongful repossession. Tudor also conceded that the defendant had reported the plaintiff's loan to each of the three major credit bureaus as a bad debt after telling her that her loan was paid in full and that in fact the defendant had continued to report the plaintiff that way for more than 3½ years after the wrongful repossession. In addition, Tudor testified that there was a four-year gap in the defendant's payment history for the plaintiff's loan but that he continued to "believe there [was] a balance remaining" on the loan. He conceded that he had no payment records on which to base his "belief" and that in the four months he had been dealing with the plaintiff's account, he had never verified that money remained due on the loan.

The next witness to testify in the plaintiff's case in chief was attorney Leonard Berg, who testified to the steps he took on behalf of the plaintiff, described in detail above. He also testified that he had attempted to obtain information from the defendant about why the wrongful repossession had occurred, that he received a "partial payment history" that did not include any information regarding the first four years of the term of the loan, and that he "never" received any response from the defendant regarding the items missing from the plaintiff's car. On cross-examination, Berg testified that in May 2001, one year prior to filing suit and three full years prior to the trial, he had made a demand of $5,000 from the defendant. On redirect examination, Berg testified that he never received a response from the defendant to his demand letter.

Following Berg's testimony, the plaintiff testified. In addition to the details of the

7

events of March 11, 2000, and the days immediately thereafter, described above, she testified to the details of her payment dispute with the defendant. She testified that prior to the merger, she had no problems with her account. After the merger, she received calls from the defendant claiming she was past due on her loan payments. She disputed this and requested a payment history from the defendant. The document sent to the plaintiff in response to her request was incomplete and did not coincide with her records of payments made. Unable to resolve the problem with the defendant's representatives, she reverted to using her payment booklet, as she had done prior to the dispute. She testified that she made her final payment on the loan in late 1999. She subsequently received a phone call from Haywood, who informed her that she still owed the defendant money. The plaintiff and Haywood agreed that the plaintiff would take proof of her final payment to her local branch, which the plaintiff did. She testified that she had believed the matter was then resolved. She had no further contact from the defendant until she received her title and release letter in the mail. She testified that subsequent to the wrongful repossession and the return of the car to her, she had received no demands for the payment of any balance due from the defendant and that until this incident with the defendant, she had never hired or even consulted with an attorney.

On April 7, 2004, the trial continued. Gene Tudor testified again, this time as the first witness in the defendant's case in chief. Tudor testified to a number of attempts by the defendant to contact the plaintiff in the weeks prior to the repossession, and he testified the attempts were made because the plaintiff still owed a past-due balance of $314.96. Tudor authenticated documents from the defendant showing a past-due balance of $314.96, testified that a charge-off of that balance had occurred, and further testified that due to the inadequacies of the defendant's computer system, a charge-off would show up as a zero balance account and could lead to the generation of a paid-in-full letter and to the release of the lien and the title. On cross-examination, Tudor conceded that he never checked to see if

8

the individual who actually sent the paid-in-full letter had done so mistakenly, and he conceded that the document of the defendant's that showed a charge-off had been prepared six months after the plaintiff filed suit, rather than at the time of the alleged charge-off. Tudor further conceded that despite the purported attempts to contact the plaintiff, the last actual contact with her had been when Haywood told her to go to the branch to resolve the situation. Tudor also acknowledged that Haywood knew that the plaintiff disputed any balance due, and Tudor conceded that the document upon which he based his opinion that money was still owed–the defendant's document prepared six months after the plaintiff filed suit–was inaccurate regarding the maturity date of the loan, could not be reconciled with the actual repossession order, contained incorrectly posted payment information for an eight-month period during the life of the loan, and included late charges he could not verify were correct. No redirect examination was conducted, and the defendant rested.

The jury returned with a verdict against the defendant, assessing punitive damages in the amount of $500,000. Following a hearing on the defendant's posttrial motions, the defendant filed a timely notice of appeal.

On appeal, the defendant raises a number of issues. Additional facts necessary to the resolution of this appeal shall be provided where appropriate throughout this disposition. The defendant first argues that a reversal is required because the plaintiff may not recover twice for a single injury. In support of this argument, the defendant cites *Saichek v. Lupa*, 204 Ill. 2d 127, 141 (2003), wherein the Illinois Supreme Court held that, with regard to compensatory damages, a plaintiff who sues two defendants for a single, indivisible set of injuries arising from concurrent but independent acts cannot prosecute a claim against one defendant after the plaintiff has received payment in full of a default judgment from the other defendant. The plaintiff counters that there would be no double recovery in this case, because even though the plaintiff was fully compensated by Shamrock for her compensatory

9

damages and even though Shamrock satisfied the punitive damages award entered against Shamrock, the defendant is still liable for punitive damages. We agree with the plaintiff. The single-injury rule applied by the *Saichek* court dealt only with compensatory damages. To extend the rule to cases involving punitive damages would be to fundamentally misapprehend the difference between the purpose of compensatory damages and the purpose of punitive damages. As the Seventh Circuit Court of Appeals held in *Bosco v. Serhant*, 836 F.2d 271, 281 (7th Cir. 1987), once a plaintiff has been fully compensated for the plaintiff's injuries by one or more of multiple tortfeasors, the plaintiff is precluded from recovering further compensatory damages from any of the remaining tortfeasors. However, as Judge Posner explained in *Bosco*, because punitive damages do not measure the plaintiff's loss, "piling them on top of compensatory damages is permissible." *Bosco*, 836 F.2d at 281.

Judge Posner's ruling reflects the reality, ignored in this case by the defendant but long recognized by the Illinois Supreme Court, that "[c]ompensatory damages are designed to make amends for the injuries suffered by the plaintiff, whereas punitive damages are intended to punish the wrongdoer and serve as a deterrent to antisocial behavior in the future." *Ziarko v. Soo Line R.R. Co.*, 161 Ill. 2d 267, 276 (1994). In Illinois, an award of punitive damages is not subject to contribution (*Ziarko*, 161 Ill. 2d at 277), and as Judge Posner recognized, with regard to the single-injury rule, "punitive damages should be assessed separately." *Bosco*, 836 F.2d at 281. We conclude that because *Saichek* dealt only with compensatory damages, it is inapposite to the case at bar. We further conclude that in the case at bar the punitive damages assessed against the defendant by the jury do not duplicate the punitive or compensatory damages paid by Shamrock, and no issue of double recovery exists. Because we conclude that the assessment of punitive damages against the defendant will not lead to a double recovery, we reject the defendant's related argument that the case is now moot because Shamrock satisfied the judgment against Shamrock.

10

The defendant next argues that the trial court erred when it did not enter a judgment notwithstanding the verdict because, the defendant asserts, the plaintiff failed to prove her conversion claim. In support of its position, the defendant argues that because the plaintiff admitted at the trial that she had in the past made late payments on her account, she failed to establish that she had a right to possession of the property in question at the time the property was converted, an essential element of a conversion claim. As this court has held, a court should enter a judgment notwithstanding the verdict only when the evidence, viewed in the light most favorable to the opponent, so overwhelmingly favored the movant that no contrary verdict could possibly stand. *Cruthis v. Firstar Bank, N.A.*, 354 Ill. App. 3d 1122, 1130 (2004). A judgment notwithstanding the verdict is inappropriate where " 'reasonable minds might differ as to inferences or conclusions to be drawn from the facts presented.' " *Cruthis*, 354 Ill. App. 3d at 1130 (quoting *Pasquale v. Speed Products Engineering*, 166 Ill. 2d 337, 351 (1995)). This court reviews *de novo* a trial court's judgment notwithstanding the verdict on the issue of punitive damages. *Cruthis*, 354 Ill. App. 3d at 1130. Although the defendant acknowledges the foregoing *Cruthis* principles, the defendant completely ignores them when applying its analysis. There is no doubt that in this case the evidence–which is described in detail above and which included an admission from the corporate representative of the defendant that the plaintiff's car never should have been repossessed, that the defendant had no right to repossess the plaintiff's car, and that, in fact, the repossession was illegal–viewed in the light most favorable to the plaintiff, does not so overwhelmingly favor the defendant with regard to whether the plaintiff had a right to the possession of the property in question that no contrary verdict could possibly stand. The trial court did not err when it declined to enter a judgment notwithstanding the verdict in this case.

The defendant next argues that punitive damages are improper in this case under Illinois law. The defendant first contends that punitive damages are impermissible because

11

there were no compensatory damages in this case. This argument is belied by the facts found in the record on appeal. The trial court clearly and unequivocally found that the plaintiff in this case was entitled to compensatory damages in the amount of $25,000 for the actions of the defendant and Shamrock. The fact that these compensatory damages were satisfied by Shamrock prior to the trial against the defendant does not negate the existence of the award of damages or of the injuries from which that award flowed.

The defendant's second explanation for why punitive damages were improper in this case is its assertion that the defendant's conduct in this case did not give rise to punitive damages. We begin by noting that it is undisputed that in Illinois the tort of conversion may under proper circumstances support an award of punitive damages. *Cirrincione v. Johnson*, 184 Ill. 2d 109, 114 (1998). Although the question of whether punitive damages can be awarded for a particular cause of action is a matter of law, the question of whether a defendant's conduct was sufficiently willful or wanton to justify the imposition of punitive damages is for the jury to decide. *Cirrincione*, 184 Ill. 2d at 116. This factual finding is reviewed under a manifest-weight-of-the-evidence standard. *Cirrincione*, 184 Ill. 2d at 116. Punitive damages for the tort of conversion properly lie where, *inter alia*, the defendant acts willfully or with such gross negligence to indicate a wanton disregard of the rights of others. *Cirrincione*, 184 Ill. 2d at 115-16. In the case at bar, the jury's conclusion that the conduct of the defendant in this case warrants punitive damages is not against the manifest weight of the evidence. To the contrary, the evidence properly before the jury included, *inter alia*, uncontradicted testimony from a former employee of the defendant that the defendant operated a payment-processing-and-collection system wherein (1) bank personnel consistently failed to retrieve payments from facilities where customers had sent the payments, (2) those facilities were sometimes closed without informing customers and notifying them where to send future payments, (3) as a result of the foregoing inadequacies,

12

payments were sometimes lost and never credited to any account, (4) computer system coding problems prevented tellers from identifying the correct account to which a payment should be applied, (5) all of the foregoing problems led to unreliable computer data that in turn led to collection notices that were inconsistent and internally irreconcilable, (6) collection agents such as the witness proceeded with collections, because of the large number of accounts they were assigned to handle, even though they knew that the system had problems and they could not verify the accuracy of debt information they were receiving, and (7) there was only a 50% probability that the data the witness relied upon before ordering the repossession of the plaintiff's car was accurate. The witness also testified that members of the defendant's management were aware of the foregoing problems with their payment-processing-and-collection system and that prior to ordering the repossession of the plaintiff's car, the witness was aware the plaintiff disputed the claim that she still owed money to the defendant. Ample evidence, described immediately above and elsewhere in this disposition, was available to support the conclusion that the defendant had acted willfully or with such gross negligence to indicate a wanton disregard of the rights of others, and the jury's determination that the conduct of the defendant warrants punitive damages is not against the manifest weight of the evidence.

The defendant next takes issue with the amount of damages assessed against it. The defendant raises two arguments regarding the amount of damages awarded: a common law argument that the amount is grossly excessive and an argument that the award is unconstitutional. The defendant seeks a new trial or a remittitur. With regard to the first argument, to determine whether an award is excessive in a given case, Illinois courts look to a fact-specific set of relevant circumstances, including the following: (1) the nature and enormity of the wrong, (2) the financial status of the defendant, and (3) the potential liability

of the defendant. *Franz v. Calaco Development Corp.*, 352 Ill. App. 3d 1129, 1143 (2004). The highly factual nature of the assessment of punitive damages dictates that a great amount of deference should be afforded the determination made at the trial court level, and to reflect that deference and the highly factual nature of the determination, we review the assessment of punitive damages on a manifest-weight-of-the-evidence standard. *Franz*, 352 Ill. App. 3d at 1144-45. A jury's assessment of punitive damages will not be reversed unless the manifest weight of the evidence shows that the assessment was so excessive that it demonstrated passion, partiality, or corruption on the part of the jury. *Franz*, 352 Ill. App. 3d at 1145. In the case at bar, the defendant argues that the jury's verdict was the result of "passion and prejudice" inflamed by the plaintiff's references to the fact that the defendant had reported the plaintiff to each of the three major credit bureaus as a bad debt after telling her that her loan was paid in full and had continued to report the plaintiff as such for more than 3½ years after the wrongful repossession. The defendant claims as follows in its brief on appeal: "[T]he sole evidence in this record on reports to the credit bureaus was Gene Tudor[,] who, when the plaintiff asked, said that there was 'a report', not over 100 reports to three different credit bureaus for over 40 months, as plaintiff argued." In fact, when asked by the plaintiff if the defendant had made a bad report to each of the three credit bureaus about the plaintiff every month for more than 3½ years after the wrongful repossession, Tudor answered "Yes." The defendant's efforts to distort the record notwithstanding, the fact is that the credit reports made up a very small part of the plaintiff's case. As the defendant concedes, the plaintiff sued for conversion, not for misrepresentation or for false credit reports, and a thorough review of the record on appeal reflects that the plaintiff's case was premised on the acts of conversion, with the false credit reporting used merely as evidence of the insouciance and intransigence of the defendant. The fact that the jury considered the false credit reporting a factor in its overall assessment of the defendant's conduct–as evidenced by a question the

14

jury sent to the judge: "Can the jury make [the defendant] clear credit reports as part of the judgment?"–hardly means that the verdict of the jury was based upon "passion and prejudice." The plentiful evidence of the defendant's transgressions is discussed at length in other parts of this disposition. The defendant is not entitled to a new trial or a remittitur on the basis of its common law claim.

With regard to the defendant's second argument concerning the amount of damages assessed against it, we review *de novo* whether a punitive damages award is constitutional. *State Farm Mutual Automobile Insurance Co. v. Campbell*, 538 U.S. 408, 418, 155 L. Ed. 2d 585, 601, 123 S. Ct. 1513, 1520 (2003). We consider three guideposts as we review awards of punitive damages: (1) the degree of the reprehensibility of the defendant's misconduct, (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award, and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases. *Campbell*, 538 U.S. at 418, 155 L. Ed. 2d at 601, 123 S. Ct. at 1520. The *Campbell* decision and previous decisions of the United States Supreme Court counsel that the most important of these guideposts is the reprehensibility of the defendant's misconduct. *Campbell*, 538 U.S. at 419, 155 L. Ed. 2d at 602, 123 S. Ct. at 1521. To determine reprehensibility, reviewing courts consider the following factors: (1) whether the harm caused was physical as opposed to economic, (2) whether the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others, (3) whether the target of the conduct had financial vulnerability, (4) whether the conduct involved repeated actions or was an isolated incident, and (5) whether the harm was the result of intentional malice, trickery, deceit, or mere accident. *Campbell*, 538 U.S. at 419, 155 L. Ed. 2d at 602, 123 S. Ct. at 1521.

In the case at bar, the harm caused was economic rather than physical. Although we agree with the plaintiff that the *potential* for physical harm exists anytime a vehicle is

15

wrongfully repossessed, no evidence of physical harm was presented in this case. Likewise, although the tortious conduct in this case evinced an indifference to and reckless disregard of the property rights of the plaintiff, as well as extremely poor organization and judgment on the part of the defendant, it did not evince an indifference to or a reckless disregard of the health or safety of the plaintiff. With regard to the financial vulnerability of the target, there is no doubt that no later than October 10, 2000, long before the present suit was filed, the defendant was on notice that the plaintiff was a single, black female, a factor the plaintiff alleges proves her financial vulnerability. However, no evidence was presented that the defendant was aware of this particular plaintiff's financial vulnerability at the time the conversions occurred, nor, in fact, was evidence presented that she was any more financially vulnerable than any other consumer seeking redress from a major corporation. With regard to whether the conduct involved repeated actions or was an isolated incident, the plaintiff presented evidence that the defendant had committed wrongful repossessions "more than one time," although the witness for the plaintiff could not specify the number of occasions. With regard to whether the harm resulted from intentional malice, trickery, deceit, or mere accident, we note that although there was no evidence of intentional malice, trickery, or deceit on the part of the defendant, there was ample evidence–including uncontradicted testimony that the management of the defendant was aware of the defendant's system's many, many inadequacies–that the harm to the plaintiff was no "mere accident." Accordingly, although there is no doubt that the defendant's misconduct in this case was reprehensible, we conclude that it was quantitatively different from the misconduct found in *Mathias v. Accor Economy Lodging, Inc.*, 347 F.3d 672 (7th Cir. 2003), and we cannot conclude on the basis of *Campbell* and other United States Supreme Court precedent that the misconduct in this case supports punitive damages in the amount of $500,000.

The second *Campbell* guidepost is the disparity between the actual or potential harm

16

suffered by the plaintiff and the punitive damages award, also commonly referred to as proportionality. The United States Supreme Court has repeatedly declined to impose upon the states a bright-line ratio that a punitive damages award cannot exceed. *Campbell*, 538 U.S. at 425, 155 L. Ed. 2d at 605, 123 S. Ct. at 1524. Nevertheless, the Court has suggested that, in practice, "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *Campbell*, 538 U.S. at 425, 155 L. Ed. 2d at 605-06, 123 S. Ct. at 1524. On the other hand, the Court acknowledged that ratios greater than those the Court had previously upheld may comport with due process if a particularly egregious act has resulted in only a small amount of economic damages (*Campbell*, 538 U.S. at 425, 155 L. Ed. 2d at 606, 123 S. Ct. at 1524), a circumstance readily apparent in the case at bar. Although the plaintiff relies on *Mathias v. Accor Economy Lodging, Inc.*, 347 F.3d 672, 677 (7th Cir. 2003), in which the court affirmed a 37-to-1 punitive-damages-to-compensatory-damages ratio, and argues, "When a defendant with massive financial resources targets a vulnerable victim whose economic loss is modest, the due process clause justifies a high ratio of punitive damages," we are mindful of the United States Supreme Court's admonition, in *Campbell*, that "[t]he wealth of a defendant cannot justify an otherwise unconstitutional punitive damages award." *Campbell*, 538 U.S. at 427, 155 L. Ed. 2d at 607, 123 S. Ct. at 1525. In the case at bar, following a prove-up, compensatory damages were adjudged to be $25,000. The punitive damages award was $500,000, an amount 20 times larger than the amount of compensatory damages.

The final *Campbell* guidepost is the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases. In the case at bar, this guidepost favors neither party. Neither party has presented any cases or statutes regarding this factor that are comparable in a meaningful sense to this case, nor is this court aware of any such cases or statutes. Accordingly, this guidepost is of minimal value in our

17

assessment, as indeed it was to the United States Supreme Court in *Campbell*. See *Campbell*, 538 U.S. at 428, 155 L. Ed. 2d at 607-08, 123 S. Ct. at 1526.

Applying the principles set forth in *Campbell* and other United States Supreme Court precedent, we conclude that the misconduct in this case does not support punitive damages in the amount of $500,000. The ordering of a remittitur in lieu of wholly setting aside an excessive jury verdict, the affirmance of which would be erroneous, has consistently been acknowledged to promote the ends of justice and the termination of litigation. *Haid v. Tingle*, 219 Ill. App. 3d 406, 412 (1991). The practice of ordering a remittitur of excessive damages has long been recognized and accepted as a part of Illinois law. *Best v. Taylor Machine Works*, 179 Ill. 2d 367, 412 (1997). Supreme Court Rule 366(a)(5) (155 Ill. 2d R. 366(a)(5)) specifically provides that a reviewing court has the power to grant any relief, including the entry of a remittitur. See *Luye v. Schopper*, 348 Ill. App. 3d 767, 779 (2004). An appellate court may modify a trial court's order to reflect the proper amount of damages. *Luye*, 348 Ill. App. 3d at 779. A remittitur is an agreement by the plaintiff to relinquish, or remit, to the defendant that portion of the jury's verdict which constitutes excessive damages and to accept the sum which has been judicially determined to be properly recoverable. *Luye*, 348 Ill. App. 3d at 779. The only alternative to a remittitur in a case where the verdict exceeds the properly recoverable damages is for the trial judge to order a new trial. *Luye*, 348 Ill. App. 3d at 779. Nevertheless, a court does not have the authority to reduce the damages by the entry of a remittitur if the plaintiff objects or does not consent. *Luye*, 348 Ill. App. 3d at 779. The trial court must afford the plaintiff the choice of agreeing or refusing to the entry of a remittitur, with the proviso that the plaintiff's refusal to agree to the entry of a remittitur will result in the ordering of a new trial. *Luye*, 348 Ill. App. 3d at 779. After a careful consideration of the evidence detailed elsewhere in this disposition in light of the foregoing United States Supreme Court principles regarding the constitutionality of punitive

18

damages awards, we conclude that an award of punitive damages against the defendant in the amount of $225,000 would be both constitutional and appropriate, and we note that such an award would be less than the double-digit ratio between punitive and compensatory damages against which the *Campbell* Court cautioned. *State Farm Mutual Automobile Insurance Co. v. Campbell*, 538 U.S. 408, 425, 155 L. Ed. 2d 585, 605-06, 123 S. Ct. 1513, 1524 (2003). Accordingly, we hereby modify the circuit court's judgment, and we remand for a remittitur in the punitive damages judgment against the defendant to the amount of $225,000. See *Lowe Excavating Co. v. International Union of Operating Engineers Local No. 150*, 358 Ill. App. 3d 1034, 1046 (2005). The remittitur is conditioned upon the plaintiff's consent. If the plaintiff does not consent, within a reasonable time period as set by the trial court, then a new trial between the plaintiff and the defendant on the issue of the amount of punitive damages is proper.

Pursuant to the authority of Supreme Court Rule 366(a)(5), we affirm as modified the judgment of the circuit court, and we remand for further proceedings. The modified judgment is as follows: If the plaintiff consents to a remittitur, a judgment shall be entered in favor of the plaintiff and against the defendant in the reduced amount of $225,000. If the plaintiff does not consent, within a reasonable time period as set by the trial court, to the entry of the remittitur, then the trial court shall order a new trial between the plaintiff and the defendant on the issue of the amount of punitive damages.


Affirmed as modified; cause remanded.


HOPKINS and CHAPMAN, JJ., concur.

NO. 5-04-0548

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

| | | |
|---|---|---|
| LORRAINE TURNER, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Madison County. |
| | ) | |
| v. | ) | No. 02-L-357 |
| | ) | |
| FIRSTAR BANK, N.A., | ) | |
| | ) | |
| Defendant-Appellant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| SHAMROCK RECOVERY SERVICE, INC., | ) | Honorable |
| | ) | Ralph J. Mendelsohn, |
| Defendant. | ) | Judge, presiding. |

**Opinion Filed**: March 6, 2006

**Justices**: Honorable Stephen L. Spomer, P.J.

Honorable Terrence J. Hopkins, J., and
Honorable Melissa A. Chapman, J.,
Concur

**Attorneys for Appellant**
Stephen R. Swofford, James E. Claybourne, Nancy G. Lischer, Madelyn J. Lamb, Hinshaw & Culbertson, LLP, 222 North LaSalle Street, Suite 300, Chicago, IL 60601-1081

**Attorney for Appellee**
David L. Antognoli, 2227 South State Route 157, P.O. Box 959, Edwardsville, IL 62025