2026 IL App (1st) 242491-U

SECOND DIVISION
June 16, 2026

No. 1-24-2491

**NOTICE**: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | |
|---|---|
| IN RE MARRIAGE OF: | ) |
| | ) Appeal from the Circuit Court of |
| DARRYL THOMAS, | ) Cook County, Illinois |
| | ) |
| Petitioner-Appellee, | ) |
| | ) No. 17 D 630062 |
| v. | ) |
| | ) |
| REGINA THOMAS, | ) Honorable Bonita Coleman |
| | ) Judge Presiding |
| Respondent-Appellant. | ) |

_____

JUSTICE ELLIS delivered the judgment of the court.
Justices McBride and D.B. Walker concurred in the judgment.

**ORDER**

¶ 1    *Held*: Affirmed as modified and remanded. This court modifies allocation of property so that ex-wife retains two-thirds of her pension and two-thirds of equity in her home, while one-third of pension and one-third of home equity is allocated to ex-husband.

¶ 2    This is an appeal from a judgment of marital dissolution between Darryl and Regina Thomas. Regina challenges the trial court's allocation of marital property. After a bench trial, the court allocated half of Regina's pension and half the equity in her home to Darryl. In our view, the court abused its discretion in failing to properly consider that Regina is the sole provider and caregiver for Regina's and Darryl's disabled adult son. We thus modify the distribution of

property such that Regina is allocated two-thirds of her pension and two-thirds of the equity in her home, while Darryl is allocated one-third of her pension and one-third of the home equity.

¶ 3                                    BACKGROUND

¶ 4      Darryl and Regina married on October 5, 1993. Each had a child that predated the marriage, though Darryl's did not reside with him. They had a child together before their marriage as well—Darryl, Jr., whom they sometimes called "D.J." and sometimes "Junior." (Regina calls him "Junior" on appeal, so we will, too.) Junior was born in 1992 with significant heart and lung afflictions and developmental disabilities. As an adult, Junior remains unable to live independently.

¶ 5      The parties lived together for twenty years until, in 2013, Darryl was incarcerated for twenty months on a domestic-battery conviction (not involving Regina). He was released in 2015, at which time Regina and Darryl separated, though still married. So it helps to differentiate between their first twenty years, from 1993 to 2013, when they were married and cohabitating, and the remaining years up to the present, when they were separated.

¶ 6                                    I. 1993 to 2013

¶ 7      After their marriage in 1993, the parties lived together with Regina's child and Junior in the home of Darryl's mother. In 2000 or 2001, they bought a home in Riverdale. The court found that, over the first twenty years of marriage, each spouse contributed financially to the marriage and to the care and needs of Junior and Regina's child. Regina had a more traditional wage-earning job with the Chicago Transit Authority ("CTA"), which among other things earned her a pension. The trial court noted that Regina provided no evidence of her salary or earnings during the marriage. (She retired in 2024 and receives a pension of $4,374 per month.)

¶ 8    Darryl, who appeared *pro se*, testified that his education was limited to a GED and he "always worked" during the marriage or sought unemployment benefits when he was between jobs (it appears he received benefits at various periods in 2002, 2007, and 2010). His jobs included work as a cook, material handler, and forklift driver. Some were traditional W-2 wage-earning jobs, others not; Darryl would sometimes seek day-labor work. Regina attempted to prove that Darryl was jailed more than once during this time for traffic-related offenses, but the evidence was excluded for lack of foundation or on hearsay grounds.

¶ 9    Darryl had an extramarital affair during their marriage and fathered three children out of wedlock. He has no relationship with those children but is obligated for child support.

¶ 10    Regina handled the finances. She filed for personal bankruptcy protection twice over unpaid income taxes, once in 2006 and again in 2011. The testimony was vague on the circumstances accompanying these bankruptcy filings. Though Regina blamed their financial problems on Darryl, the trial court found that "Regina filed bankruptcy petitions individually without explanation as to credible and specific factors that led to the bankruptcy and/or how Darryl's actions or inactions factored into the need to file for debtor's relief."

¶ 11    As noted, in 2013, Darryl was imprisoned for twenty months on a domestic-battery conviction involving the mother of his out-of-wedlock children.

¶ 12                                    II. 2015 to Present

¶ 13    Darryl was released in 2015, but the parties had separated by then. Darryl moved in with his sister. Darryl filed for divorce in 2017. Regina filed cross-petitions in 2018. The proceedings moved slowly. Darryl moved back into the Riverdale home in 2019; he paid rent to Regina and slept in the basement with his dog.

¶ 14    The Riverdale home was sold in 2022 or 2023. According to Regina, the sale price was $103,000, the proceeds of which paid off a $90,000 mortgage. Regina testified that a $1,000 net profit remained after associated fees and costs. Regina used the profit to pay for expenses associated with moving out of a sold home.

¶ 15    Darryl claimed he did not know the house had been sold until he was suddenly ordered to leave. He testified that Regina handled the entire transaction, from selecting a realtor through closing, without his knowledge; he testified that he has never seen the details of the transaction. He claimed that Regina sold the house to a co-worker.

¶ 16    Regina testified that Darryl selected the realtor and knew full well that the house was being sold. The trial court found that Regina testified "incredibly" on this point and likewise noted that Regina presented no documentary evidence of the sale of the Riverdale home.

¶ 17    From September 2017 until June 2022, Darryl worked as a forklift operator for Gotham Greens. He was then fired in a "mass layoff" and collected unemployment insurance. He worked for Skyline Furniture as a fabricator—applying fabric to the wood furniture—until he was injured on that job in June 2023. He received worker's compensation benefits until he was cleared for return to work, by which point the job was no longer open for him. But he testified that he would be physically unable to perform that job, in any event.

¶ 18    Though he did not specify how he was injured, Darryl testified that he had a hip replacement and "had to have [his] spine bone cut, and they put rods and screws in [his] spine because [his] spine is pushed up against [his] nerve that goes all the way down [his] leg. So it's kind of impossible for [him] to work." He receives shots for the pain from a doctor who has recommended that a "monitor" be placed under his skin, but he is afraid of that procedure. He testified that if he walks more than a few hours, the pain is excruciating.

¶ 19 Regina bought a home in Matteson in 2023 and lives there with Junior. She owes about $181,000 on the home, which is valued at approximately $205,000. She retired from the CTA in 2024. Darryl currently lives in Calumet Park in an apartment with monthly rent of $900.

¶ 20 Regina's only disclosed income was her monthly CTA pension of $4,374. Her son Junior receives $943 a month in SSI benefits. Darryl receives biweekly unemployment benefits of $421, or a $915 monthly benefit. To make ends meet, Darryl sells his blood plasma.

¶ 21 Regina incurred debt since the 2013 separation, about $15,000 in credit-card bills and roughly $20,000 in federal income tax debt. The court found this debt to be personal to Regina, who offered no evidence that any of this debt was incurred for the marital estate.

¶ 22                                      III. Closing Arguments

¶ 23 In closing, Darryl (self-represented) argued that he was being unfairly demonized. He said that he did his best to provide income during the marriage and that, while he committed adultery, neither spouse was faithful to the other during the marriage.

¶ 24 Regina (via counsel) stated that there was no point in seeking child support from Darryl, as he would be unable to pay. Counsel argued for a "*status quo*" allocation, meaning Regina keeps what is hers, and Darryl keeps what is his. He noted that Junior was disabled, was unable to work, and brought in only $943 a month in social security disability income. Counsel said "it's not enough to support him and his needs" and that Darryl provides "no child support," "no money for his child."

¶ 25 Counsel asked the court to balance "Regina's positive contribution, her responsible conduct as opposed to Darryl's negative contribution, his irresponsible conduct." Counsel further argued that Darryl "isn't entitled to support from my client. My client, give him money out of

her pension? She's to support him? Anything that she has to give out of the pension will hurt the household and *** the child as a result."

¶ 26                               IV. Court Ruling

¶ 27    The court ordered that the CTA pension be divided equally between Regina and Darryl. The court further ordered that Darryl was entitled to half the equity in Regina's current home. Each party would take their own debt and keep their own cars (Regina, a 2017 Mercedes; Darryl, a 2005 Chevy Tahoe). The court ordered mediation on Darryl's visitation with Junior. The court denied maintenance to either party.

¶ 28    As noted, the court found that each spouse contributed to the marital estate during the marriage. The court rejected Regina's attempt to "demonize" Darryl "without credible evidence connecting and showing the adverse impact on the value of the marital assets to Darryl's criminal conviction and incarceration, alleged domestic battery toward her and extramarital affair resulting in the birth of children during the marriage." The court emphasized its duty to divide the marital estate "without regard to marital misconduct." 750 ILCS 5/503(d) (West 2022).

¶ 29    The court found that Darryl consistently contributed to the marriage and family when able. The court was skeptical that Regina fully disclosed her income, finding it hard to believe that someone who received W-2 income would have such difficulty paying income taxes (though no evidence was tendered and no finding was made as to what, if any, withholdings Regina selected on her W-4 form while employed). This appeal followed.

¶ 30                               ANALYSIS

¶ 31    Regina, represented by counsel, argues on appeal that the court erred in giving half her monthly pension to Darryl and in not setting up a trust for Junior, their disabled adult son. Darryl, who appeared *pro se* in the trial court, did not file a response brief. We took this case on

the appellant's brief only. And we start by considering our jurisdiction, which we have a duty to address even if the parties do not raise a challenge. *People v. Smith*, 228 Ill. 2d 95, 104 (2008).

¶ 32                                    I. Jurisdiction

¶ 33    The trial court signed and dated its final judgment on November 1, 2024. But for reasons unclear to us, the order was not e-filed (that is, uploaded onto the circuit court clerk's electronic filing system) until November 6. Regina filed her notice of appeal on December 6, 2024.

¶ 34    Illinois Supreme Court Rule 303(a)(1) (eff. July 1, 2017) provides, in relevant part, that "[t]he notice of appeal must be filed with the clerk of the circuit court within 30 days after the *entry* of the final judgment appealed from." (Emphasis added.) That begs the question of when the court "entered" its judgment—on November 1, when it was signed and dated, or on November 6, when it was filed with the clerk. If it was the latter, Regina's notice of appeal was timely. But if the order was "entered" on November 1, the notice of appeal was untimely, and we would have no choice but to dismiss this appeal for lack of jurisdiction. *Smith*, 228 Ill. 2d at 104; *Secura Insurance Co. v. Illinois Farmers Insurance Co.*, 232 Ill. 2d 209, 217 (2009).

¶ 35    Illinois Supreme Court Rule 272 (eff. Jan. 1, 2018) answers the question. Titled "When Judgment is Entered," that rule reads, in pertinent part:

> "If at the time of announcing final judgment the judge requires the submission of a form of written judgment to be signed by the judge or if a circuit court rule requires the prevailing party to submit a draft order, the clerk shall make a notation to that effect and the judgment becomes final only when the signed judgment is filed."

¶ 36    At first blush, this rule might appear to apply only to situations where the court first makes an oral ruling, followed later by a written order. Indeed, one of the principal reasons the rule was adopted was to address confusion when an oral ruling is made on a different date than

the written judgment is signed, so parties did not have to guess about the timing of their appeal rights. See *Stoermer v. Edgar*, 104 Ill. 2d 287, 293 (1984) ("Rule 272 was intended 'to resolve the difficulties which had arisen regarding the timeliness of an appeal where an oral announcement of judgment from the bench antedated the entry of a written judgment order' " (quoting *West v. West*, 76 Ill. 2d 226, 233 (1979)).

¶ 37　But our supreme court has now made clear that the overriding purpose of Rule 272 is "to establish a uniform date for determining when judgments are considered entered," and "the record date is the controlling date for the entry of *all* judgments." *People v. Perez*, 2014 IL 115927, ¶ 17 (emphasis in original).

¶ 38　To put a finer point on it: "under Rule 272, the 30-day period for filing a notice of appeal begins to run when the written judgment order is 'filed with the clerk of court.' " *Id.* ¶ 22 (quoting *Granite City Lodge No. 272, Loyal Order of the Moose v. City of Granite City*, 141 Ill. 2d 122, 126 (1990)).

¶ 39　So the fact that the court signed and dated the order on November 1, 2024, is of no significance. The operative trigger is the date the signed order was *filed* with the circuit court clerk. Here, that date was November 6, 2024. Regina filed her notice of appeal thirty days later, on December 6, 2024. The notice of appeal was timely, and we have jurisdiction.

¶ 40　　　　　　　　　　　　II. Allocation of Assets

¶ 41　Regina claims the trial court erred in allocating half her CTA pension to Darryl. She argues that the court did not sufficiently account for the fact that she cares for Junior, their dependent, disabled adult son. She also argues that the court erred in finding that each party contributed to the marital estate. At a minimum, she says, the court should have created a trust for Junior under state law.

¶ 42    To the extent the trial court made factual findings, we review those findings for manifest error. *In re Marriage of Romano*, 2012 IL App (2d) 091339, ¶ 44. We will reverse those findings only if the opposite conclusion is clearly evident. *Id*. We are likewise deferential to the court's allocation decisions. We will not reverse the court's distribution of marital property "unless the court clearly abused its discretion." *In re Marriage of DeRossett*, 173 Ill. 2d 416, 422 (1996).

¶ 43    The gravamen of Regina's argument is that she alone cares for Junior, and taking away half her pension hinders her ability to do so. She acknowledges that she can't count on Darryl for child support, but she argues that it should be Darryl, not her, who bears that brunt.

¶ 44    Section 503(d) of the Marriage and Dissolution of Marriage Act provides several factors to consider in dividing marital property. See 750 ILCS 5/503(d) (West 2022). They include:

(1)   each party's contribution to the marital property;

(2)   the dissipation by each party of the marital property;

(3)   the value of the property assigned to each spouse;

(4)   the duration of the marriage;

(5)   the relevant economic circumstances of each spouse when the property is divided;

(6)   any obligations and rights arising from a prior marriage;

(7)   any prenuptial or postnuptial agreements;

(8)   the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities, and needs of each of the parties;

(9)   the custodial provisions for any children;

(10) whether the apportionment is in lieu of or in addition to maintenance;

(11) the income-generating potential of each spouse; and

(12) the tax consequences of the property division upon the respective economic

circumstances of the parties. *Id*.

¶ 45    The trial court considered each of these factors to the extent they were applicable. The court rejected Regina's claim that she contributed much more financially to the marriage than Darryl, noting that she never showed how much money she earned with the CTA at any given time, much less that it significantly exceeded Darryl's contribution. And the trial court reasoned that Darryl's financial contributions and care for both Regina's child and their child, Junior, over the twenty-year marriage allowed Regina to work full-time and earn a retirement pension that was indisputably marital property.

¶ 46    Those findings were not against the manifest weight of the evidence. Though Regina's government job provided more stable income, she never proved that she provided more income than Darryl. And non-financial contributions obviously matter, too. The court correctly noted that Darryl's contributions to the care of the two resident children helped Regina work a full-time job that has now given her this pension.

¶ 47    Armed with those facts, the court did not abuse its discretion in concluding that Darryl was entitled to *some* portion of the marital property—Regina's CTA pension and the equity in her home. The court could have reasonably determined that it would be inequitable to deny Darryl *any* portion of the marital property.

¶ 48    But the court abused its discretion in the division it chose. We agree with Regina that the court did not adequately account for the fact that Regina is the sole caregiver and financial support for Junior, their adult disabled son. It is uncontested that Darryl has no means to provide financially for Junior, leaving it all to Regina. As Regina's counsel correctly noted, even if the court ordered support from Darryl, he could not pay it.

¶ 49    To split the marital property *equally* but then place *all* the burden of care and support of a

disabled adult child on Regina, absolving Darryl of any responsibility, is a result we cannot accept. Unlike most children, unfortunately, Junior will not grow up, so to speak; he will always be dependent on someone else for care and support. That person, under the circuit court's ruling, will always be Regina, while Darryl walks away with half the marital property.

¶ 50    And because the record shows that Darryl cannot be counted on for financial support of Junior, the equitable thing to do is to modify the division of property. Children, once they achieve majority status, do not typically factor into the division of property. But this case presents the rather unique situation where three adults are affected by the distribution of marital property, and Regina is responsible in all respects for two of the three. The division of property should reflect that fact.

¶ 51    We have authority under Illinois Supreme Court Rule 366(a)(5) (eff. Feb. 1, 1994) to "enter any judgment and make any order that ought to have been given or made," including modifying the trial court's judgment. *McGinley Partners, LLC v. Royalty Properties, LLC*, 2021 IL App (1st) 200390, ¶ 56; *Turner v. Firstar Bank, N.A.*, 363 Ill. App. 3d 1150, 1165 (2006); *Nemeth v. Banhalmi*, 125 Ill. App. 3d 938, 972 (1984).

¶ 52    We thus modify the trial court's judgment to reflect the following division of marital property: Regina is entitled to two-thirds of her CTA pension and two-thirds of the equity in her home, and Darryl is entitled to one-third of Regina's CTA pension and one-third of the equity in her home. The matter is remanded so the trial court may take whatever steps necessary, if any, to enforce this modified judgment.

¶ 53    The judgment is affirmed in all other respects.

¶ 54    Affirmed as modified and remanded.