FOURTH DIVISION
March 24, 2011

No. 1-09-3603

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| KATHLEEN LAWLOR, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee and | ) | Cook County. |
| Cross-Appellant, | ) | |
| v. | ) | No. 05 CH 13876 |
| | ) | |
| NORTH AMERICAN CORPORATION | ) | |
| OF ILLINOIS, | ) | |
| | ) | The Honorable |
| Defendant-Appellant and | ) | Carol Pearce McCarthy, |
| Cross-Appellee. | ) | Judge Presiding. |

JUSTICE LAVIN delivered the judgment of the court, with opinion.
Presiding Justice Gallagher and Justice Pucinski concurred in the judgment and opinion.

**OPINION**

Here, we are confronted with dueling appeals from the trial of an employment dispute that paradoxically concluded with both parties prevailing in their respective claims and each receiving punitive damages. The litigation itself arose out of an employment noncompetition investigation. After plaintiff left her sales position from a large corporate employer, she figured out that she was under surveillance by investigators, whom she suspected of stealing her mail and whom she ultimately learned used nefarious means ("pretexting") to obtain her private phone records. These phone records were then used by her ex-employer to investigate her activities in the waning

months of her seven years of employment. The employee, Kathleen Lawlor, filed suit against North American Corporation of Illinois (North American), after learning of the investigation. She claimed an "intrusion upon seclusion" tort and requested compensatory and punitive damages. North American's counterclaim alleged she violated her fiduciary duty of loyalty by attempting to steer business to a prospective employer and that she also communicated confidential corporate sales information to the same company.

At trial, both parties prevailed in their respective claims. A jury awarded Lawlor $1.75 million in punitive and $65,000 in compensatory damages. The trial court heard the employer's equity claim contemporaneously and, one month after the trial, it ruled in North American's favor, awarding $78,781 in compensatory and $551,467 in punitive damages.

North American's primary contention is that Lawlor failed to prove that North American was liable on an agency theory for the actions of an independent contractor that somehow acquired her private phone records. Lawlor, meanwhile, appeals from the reduction of her punitive damage award and also appeals from the trial court's judgment on the counterclaim, which raised the duty of loyalty issue. She argues that, as an at-will employee without any contractual duty to refrain from disclosing simple sales volume and commissions information, the trial court's findings were against the manifest weight of the evidence and amount to an abuse of the trial court's discretion. For the reasons that follow, we affirm the jury's verdicts against North American in Lawlor's favor and reinstate the full punitive damage verdict returned by the jury. With regard to North American's breach of loyalty counterclaim, we hold that the trial court's judgments for compensatory damages and punitive damages were against the manifest

2

weight of the evidence and we therefore reverse those judgments.

BACKGROUND

The parties engaged in four years of bruising discovery, but the testimony at the six-day trial was relatively uncomplicated. Lawlor was aggrieved that North American, through surreptitious means, acquired her mobile and home phone records in a failed effort to prove that she breached the company's noncompetition agreement. Painted with a broad brush, Lawlor presented evidence at trial to the effect that North American, through counsel and at least two independent investigators, set about the tasks of personal surveillance and getting her private phone records.

Lawlor testified that she decided to quit her job as a salesperson after her employer suddenly attempted to change her compensation agreement. Shortly after she left its employ, North American began an investigation to determine if she had violated their noncompetition agreement. The evidence at trial revealed the following sequence: (1) North American assigned an officer, Patrick Dolan, to serve as corporate liaison on the investigation; (2) North American asked its lawyer, Lewis Greenblatt, to conduct the investigation; (3) the lawyer then hired an investigator, Probe, which had worked in so-called "noncompetition" cases before; (4) Dolan gave the lawyer and the investigator personal information from the plaintiff's personnel file, including her birth date, social security number, address and telephone numbers; (5) the investigator passed this information on to yet another investigator, Discover, which, presumably through "pretexting," obtained the phone records; and (6) the phone records were then passed up the line back to North American, which used the information internally to investigate Lawlor's

3

activities by cross-checking all of the numbers found on the records. This investigation started shortly after Lawlor left North American and lasted approximately five months, by which time Lawlor had been working at a competitor for three months.

North American vigorously defended itself on all levels, attempting to prove that the investigation was conducted in an entirely proper fashion while endeavoring to separate itself, under the aegis of the thorny provisions of agency law, from the shadowy activities of the investigators. It sought a directed verdict at the close of Lawlor's case, arguing that it could not be held liable on an agency basis for the improper conduct of either of the investigation firms, one of which had been directly hired by North American's lawyer.[1] With regard to its lawsuit against Lawlor, North American sought to prove that she had improperly communicated company information to a prospective employer while still in its employ and also argued that she attempted to steer business to the prospective employer, despite the fact that it did not allege a violation of

---

[1] Defendant acknowledged, in a document entitled "North American's Opposition to Lawlor's Supplement to her Motion to Enforce Probe's Subpoena and Motion to Quash Subpoenas for Telephone Records," that both Probe and Discover were "agents of North American's attorney that had been retained to investigate Lawlor's employment activities while employed by North American." This motion was supported by an affidavit by Greenblatt that indicated that "Probe performed investigatory services, as my agent and at my direction, concerning the circumstances of Lawlor's employment at North American."

the noncompetition agreement, which was the genesis of the investigation.[2]  The evidence at trial will be described below in a witness-by-witness recitation.

*Testimony of Kathleen Lawlor*

Lawlor, an at-will employee, worked at North American as a commission-based salesperson selling printed promotional items from 1998 to 2005.  Lawlor was given wide latitude in determining the prices she charged her clients for North American's products.  Once she acquired a third party's business in the manner of a "rainmaker," the account was managed and handled by other North American employees.  During her first three years at North American, Lawlor received a salary, but beginning in 2001, she signed an agreement with North American that provided she would receive commissions of 30% of the gross profits she generated for North American, with a draw of $70,000.  Some of the accounts Lawlor generated included Komatsu, FTD, Pliant, and MapQuest, which she stated she did not receive commissions for after she left North American.  The evidence at trial revealed that Lawlor was very successful in her role for

---

[2] The noncompetition agreement may have prompted the investigation, but it was never admitted at trial.  During the course of discovery, the parties engaged in extensive motion practice before several circuit court judges regarding the agreement.  This culminated with a motion *in limine* before the trial judge where the defense attorney told the court that defendant was not arguing that the agreement was "enforceable."  This court had found a noncompetition agreement involving the same defendant unenforceable in *North American Paper Co. v. Unterberger*, 172 Ill. App. 3d 410 (1988).

her employer and that she generated income in excess of $200,000 on an annual basis, tied to the profits she made for the corporation.

The controversy that led to the dueling lawsuits seemed to have its genesis in Lawlor's attempt to acquire the business of MapQuest in March 2004, when she initially received an order for roll-up maps, and was paid 30% of North American's gross profits. Lawlor was North American's primary contact person on the account and worked closely with Kevin Bristow, an outside consultant hired by MapQuest to negotiate its print business.

In November 2004, Lawlor interviewed for a sales position at Shamrock Companies, Inc., one of North American's competitors. Lawlor flew to Cleveland and interviewed with Greg Christenson, a former North American employee and coworker of Lawlor's. As part of the interview, she toured the Shamrock facilities and met with some of the department heads. In December 2004, Lawlor sent Christenson a follow-up letter, at his request, discussing several of the accounts she worked on for North American, revealing information related to North American's gross profit margins on those accounts. In her letter to Christenson, Lawlor stated:

"Per our discussions, I will highlight where I currently am as far as total volume: By year-end, I will have billed $2,000,000 in sales with a [gross profit] of 34%. In addition, Komatsu, which is shared with Jennifer Hall, will bill an additional [$]1,600,000 with a [gross profit] of 44%. The $2,000,000 is made up of many accounts to include FTD, Mobil Travel Guide, MapQuest, Vista Management and Pliant as the majors."

Lawlor denied attempting to steer any customers to Shamrock while she was employed at North American.

In December 2004, Lawlor received an e-mail from Bristow regarding an opportunity to generate new business from MapQuest. Lawlor met with Bristow various times in January and February 2005. The MapQuest business, by all accounts, was projected to be very lucrative if everything fell into place. Plaintiff testified that when the "pitch" was getting readied, she sensed that she was being pushed aside. In March 2005, Mike Perez, Lawlor's direct supervisor, informed her that the MapQuest pitch needed to be a "sexy presentation" and would be led by another employee, Klay D'iorio. When Lawlor protested, Perez told her that she was not to have any contact with Bristow until the deal closed. During the meeting, according to Lawlor, Perez made several statements that appeared designed to distance Lawlor from the account, indicating that a different "personality" could be substituted if Lawlor were not the right person. Following the meeting, Perez e-mailed Lawlor to tell her she did a great job, but he did not know what her role would be with MapQuest moving forward. In May 2005, Perez notified Lawlor that he intended to have the MapQuest account handled by a salaried employee at North American. On June 13, 2005, MapQuest placed an order with North American for approximately $338,000. Just two days later, Lawlor separated from North American. She never received compensation from the MapQuest job that had closed just before she left.

In the beginning of June 2005, North American told Lawlor it was changing its compensation agreement so that she would no longer receive 30% commissions, but Lawlor refused to sign it and left the company. She testified that she was disgruntled because North American was attempting to change her method of compensation from the agreed 30% of profits method, just when she had brought in a big piece of business.

7

Lawlor testified that she intended to spend the summer with her three young children (age 10 and under) before taking another job. Just weeks later, she suspected that North American was investigating her after spotting what appeared to be investigators lurking around outside her house and her parents' house. Lawlor was also alarmed when she did not receive her June telephone bill.

The surveillance appeared to continue for some time. In October 2005, Lawlor learned that North American had obtained her mobile and home phone records from April 2005 through September 2005. Lawlor testified that she never authorized anybody at North American to acquire or look at her phone records. She testified that she felt violated and physically ill at the revelation that her private information had become fodder at her former employer. She avoided using her personal phone lines and enhanced the security features on her phones. She also changed the locks on her home and installed a security system.

Lawlor testified that she incurred $620,000 in legal fees (half of which she has already paid) to two law firms that handled the first wave of legal action against North American for their invasion of her privacy, but that the lawyers representing her at trial were doing so on a contingency basis. Lawlor testified that during her two months off work, she never contacted any clients from North American. She never told any clients that she was going to Shamrock. She testified that she never compromised her former employer in any conversations or business dealings with anybody affiliated with Shamrock. In August 2005, Lawlor started working at Shamrock, having concluded a long run at North American where she generated many millions of dollars in company profits. Not a single client followed.

*Testimony of Kevin Bristow*

In December 2004, Bristow, a consultant for MapQuest, contacted Lawlor to discuss a new business opportunity for North American. Bristow contacted Lawlor because he had known her for a long time and she had always been trustworthy and reliable. Through February 2005, Lawlor helped Bristow formulate a business plan to pitch to executives at MapQuest regarding the feasibility of creating a publishing division. Bristow requested that Lawlor keep their discussions to herself to avoid "the additional pressure of everybody coming and getting involved in this project from North American at that time." Bristow testified that Lawlor did not provide him with any information regarding companies other than North American.

On February 23, 2005, Bristow and Lawlor sent an e-mail to Todd Van Paris at North American recommending that MapQuest and North American begin final negotiations. Bristow and Lawlor agreed that it was the right time to include senior executives from both MapQuest and North American in the negotiations because the business opportunity was growing. Van Paris responded to Bristow, who then forwarded the response to Lawlor "to keep [her] in the loop." Despite suggestions to the contrary, Bristow testified that he never asked North American to diminish Lawlor's role with respect to the MapQuest business. Bristow testified that he contacted Van Paris because Lawlor's "boilerplate proposal" was not satisfactory for MapQuest, which was looking for a more detailed proposal. Bristow did notice that Lawlor's role was being diminished, but explained that "on such a large scale opportunity, there's a lot of complicated aspects to it, and one person is not skilled enough to do all those facets of the business." Lawlor never recommended, and Bristow never considered, involving Shamrock with the MapQuest business.

MapQuest placed some orders with North American, but they did not close the deal that was the subject of their negotiations.

Bristow testified at some length about an affidavit he signed that was prepared by North American. On that day, distressed and preoccupied with concern for his elderly, ill aunt, whom he was flying to visit later that day in England, he spoke with Perez, who threatened to prevent him from leaving the country if he did not sign an affidavit about the MapQuest deal. Bristow said he was assured that "it was not a big deal" and if he signed the affidavit and was assuaged, the dispute with Lawlor "would go away." The need for the signing was so urgent that Perez made plans to meet Bristow on his way to the airport to fly overseas. They met at the O'Hare Tollway Oasis. Bristow signed the affidavit on the hood of a car and said he did so only because he felt threatened by North American.

The court and jury heard the specifics from the affidavit, including that: (1) on several occasions between December 2004 and February 2005, Lawlor asked him to delay the process of awarding the MapQuest business to North American given the possibility that she might change jobs to Shamrock so that he could award MapQuest's business to Shamrock rather than North American; (2) Lawlor offered to introduce Bristow to someone at Shamrock who would be the "point person" until she began working at Shamrock; (3) Lawlor showed him pictures of the Shamrock facility; (4) MapQuest would be better served by Shamrock on the service side; and (5) he advised Lawlor that it was unethical to be pursuing business for one company while employed at another.

Bristow testified that those statements in the North American drafted affidavit were not

true.

*Testimony of Todd Van Paris*

Van Paris joined North American as a vice president and general manager in September 2001. Van Paris did not know about Lawlor's association with Shamrock until he met with Bristow after Lawlor had left North American. Van Paris was aware that North American had conducted an investigation of Lawlor after she left the company. Van Paris did not know whether North American was investigating Lawlor's phone numbers without her knowledge, but acknowledged receiving faxes of phone numbers from Probe, an investigative firm, that he assumed were Lawlor's. Van Paris did not receive Lawlor's permission to look at her phone logs and did not talk to anyone at Probe about Lawlor's investigation. He claimed to be unaware of anyone at North American, or anyone on its behalf, impersonating Lawlor to get her phone records. Prior to the lawsuit, Van Paris was not aware of how Lawlor's phone records were obtained. Van Paris looked at the numbers to see if any of them looked familiar to him. Van Paris also researched the phone numbers on the internet because he was concerned that Lawlor had been talking to competitors.

*Testimony of Patrick Dolan*

Dolan was the vice president of operations at North American in 2005. Dolan was the North American liaison with its attorney, Lewis Greenblatt, for the internal investigation of Lawlor and testified as an adverse witness during Lawlor's case-in-chief. Dolan also corresponded with a Mr. DiLuigi from Probe directly, who faxed him Lawlor's phone logs. Dolan provided information about Lawlor to Greenblatt and DiLuigi, including her name, address,

11

social security number, birthday, and her home and mobile phone numbers. Dolan claimed that he did not know what DiLuigi was going to do with this information, but conceded that he was not surprised when he received Lawlor's phone logs. Dolan stated that DiLuigi told him that he typically obtained the phone logs of other persons subject to similar investigations as Lawlor where there was a concern about competition. Dolan researched the phone numbers on the logs through internet searches and consulting with others, such as Van Paris, who might have recognized the numbers.

Dolan signed off on a $15,000 payment to Lewis Greenblatt's law firm for Probe's investigation of Lawlor. North American submitted a second payment to Greenblatt's law firm for the investigation in the amount of $22,994.88. When questioned why he did not ask how Probe obtained Lawlor's phone records, Dolan testified that he "relied on Mr. Greenblatt and Mr. DiLuigi in performing the procedures in the investigation."

On examination by North American's lawyer, Dolan testified that he never instructed Greenblatt how to conduct the investigation and that North American never paid Probe directly for any of the investigative work.

On recross-examination, Dolan testified that despite receiving at least five faxes from DiLuigi with telephone numbers, he never asked how or why the records were obtained and never instructed DiLuigi to stop sending them.

*Testimony of Albert DiLuigi*

Albert DiLuigi was the president and sole employee of Probe International, a local detective agency. He started this agency after serving roughly three years as a policeman.

12

DiLuigi testified that his company was hired by an attorney representing North American. DiLuigi understood that he was hired to conduct an investigation to learn if Lawlor was taking any business from North American. He testified that Dolan directed him to obtain Lawlor's telephone records. It was not Probe's first noncompetition investigation, and in the other investigations, Probe had obtained phone records.

When Probe sought to obtain phone records, it would submit a request on a preprinted form to a third-party company known as Discover. DiLiugi claimed to have very little information about Discover. He testified that he thought it was based in Florida, but did not know an address or even the city. He only had one contact, a woman named Jessica, but did not know her last name. He did, however, know that it was quite proficient in obtaining telephone records in situations like this. Once DiLuigi received the phone records from Discover, he faxed them to Dolan at North American. Dolan asked DiLuigi to follow up on who the numbers belonged to. Probe paid Discover. DiLuigi claimed to have never told anyone at North American about Discover.

DiLiugi also testified in an offer of proof about similar investigations that he conducted on several other North American employees, which included obtaining telephone records using Discover. Dolan was likewise his contact on those matters.

*Testimony of Mike Perez*

Mike Perez was Lawlor's supervisor at North American. Perez told Lawlor that he had concerns about her taking the lead on the MapQuest account. He testified that she was "responsible" for MapQuest and that Lawlor received commissions on the business until she

13

resigned. After her resignation, nobody received commissions on the MapQuest business. Perez did not know if Lawlor actually received her commissions.

Perez regularly participated in sales presentations to prospective clients. Perez stated that North American considers its gross profit margin to be confidential information and never discloses that information outside the company. Perez explained, "[w]e're in a very competitive industry, and if our competitors knew what our margin was, then they could undercut us and provide those services to our customer."

Perez testified that he was present when Bristow signed the affidavit in the parking lot of the O'Hare Tollway Oasis. According to Perez, Bristow had reviewed the affidavit multiple times prior to that occasion, and the affidavit was revised based on Bristow's feedback. The topics covered in the affidavit were based on a meeting Bristow attended at North American's facilities with Van Paris and Perez, which took place after Lawlor had left the company. Perez denied threatening Bristow in any way.

*Testimony of John Miller*

Miller has been the president of North American since 1988. He was in charge of day-to-day operations and was the final decision maker at North American. Miller made the decision to investigate Lawlor after she had left North American and asked Greenblatt to be in charge of the investigation, while Dolan oversaw the investigation. Greenblatt had been involved with North American for more than 33 years. Miller knew that Greenblatt had hired Probe to conduct the Lawlor investigation. Dolan had the authority to give Lawlor's personal information from the North American employee file to Probe so that Probe could use that information to get Lawlor's

14

phone records.

On one occasion, Dolan showed Miller a list of handwritten phone numbers and asked him if he recognized any of the numbers. Miller knew that the numbers were in relation to the Lawlor investigation but did not recognize any of the numbers. Miller never considered whether it was proper to use an employee's personal information to obtain phone records. Miller did not direct anybody to obtain Lawlor's phone records and testified that he did not dissuade Dolan or Greenblatt from obtaining phone records because he assumed that North American wanted to get phone records.

Miller also testified that in his 33 years at North American, no commissioned sales representative ever received commissions after leaving the company. North American informed Lawlor that she would not receive her 30% commission on the MapQuest business.

*Testimony of Lewis Greenblatt*

Greenblatt is an attorney in Illinois and has represented North American for more than 30 years. Greenblatt retained Probe to investigate a violation of a noncompetition clause. Greenblatt instructed Probe to contact North American and did not give Probe any other directions. Probe never sent Greenblatt documents that it had obtained as a result of the Lawlor investigation. Greenblatt did not limit what Probe could do as part of the investigation and did not call to get updates on the investigation. Greenblatt testified that the Lawlor investigation was for the benefit of North American. He sought reimbursement from North American because his firm paid Probe. Greenblatt did not bill any time in June or July 2005 on this matter.

15

*Rosemarie Egan Testimony*

Egan has been the chief financial officer at North American since 2001. Egan estimated that North American's net worth was approximately $50 million. Egan did not attend any "leadership team" meetings regarding the Lawlor investigation. After the investigation was underway, in April 2006, Egan approved an invoice to Greenblatt for approximately $22,000, of which approximately $6,000 was listed as payment for investigative services provided by Probe.

In July 2005, Egan sent Lawlor a letter requesting that Lawlor pay back $20,035 that was owed to North American as overpayment on commissions she had received. Egan included a 46-page compilation of North American financial records to support this claim, which included a spreadsheet indicating North American's sales amount and gross profits earned on various transactions involving various clients.

*Testimony of Roosevelt Boykins*

Boykins has been an employee at SBC Ameritech/AT&T since 2004. When a customer called seeking information on an account, the representative would greet the customer and ask for the customer to verify the account using a social security number or the account number. The phone company would not release any information if the caller did not provide sufficient information to confirm her identity.

*Circuit Court Proceedings*

The trial lasted six days. At the close of Lawlor's case, North American moved for a directed verdict on Lawlor's intrusion claim, which was denied. North American moved for a directed verdict on the same grounds at the close of all the evidence. The circuit court reserved

ruling on North American's second directed verdict[3] and submitted Lawlor's intrusion claim to the jury. The jury returned a verdict in favor of Lawlor on her intrusion claim, awarding $65,000 in compensatory damages and $1,750,000 in punitive damages, for a total award of $1,815,000. The jury answered a series of defense drafted special interrogatories designed to test various aspects of any verdict against North American.

The jury's answers were consistent with its verdict in plaintiff's favor based on North American's direct involvement in the investigation and its vicarious liability, finding that: (1) Discover obtained information about Lawlor's phone calls through pretexting; (2) Probe knew that Discover engaged in pretexting in order to obtain information about Lawlor's phone calls; (3) Discover was acting as Probe's agent; (4) Probe was acting as North American's agent when Probe got information about Lawlor's phone calls from Discover, which was obtained through pretexting; (5) North American knew Discover obtained information about Lawlor's phone calls through pretexting; and (6) North American authorized Probe or Discover to obtain information about Lawlor's phone calls through pretexting.

North American filed a posttrial motion, asking the court to (a) grant its second directed verdict motion filed at the close of all the evidence; or (b) enter judgment in favor of North American on Lawlor's intrusion claim; or (c) order a new trial; or (d) vacate, or reduce the

---

[3] The circuit court formally denied the motion a month later at a hearing where it also returned its verdicts on the North American counterclaim, essentially stating that the agency question was a fact issue for the jury to decide.

amount of the jury's punitive damages award. The circuit court denied the posttrial motion, but did reduce the punitive damages award by $1.1 million.

North American appeals, contending that the circuit court erred in denying its motion for directed verdict at the close of the evidence and in denying its posttrial motion for judgment on Lawlor's intrusion claim.

In her cross-appeal, Lawlor contends the circuit court erred in finding that she breached her fiduciary duty of loyalty as a North American employee by disclosing confidential North American information to Shamrock and for allegedly soliciting MapQuest's business for Shamrock. The circuit court entered judgment against Lawlor, awarding North American $78,781 in compensatory damages and $551,467 in punitive damages, totaling $630,248. Lawlor also appeals the circuit court's entry of remittitur of the jury's punitive damages from $1,750,000 to $650,000; the circuit court's entry of a directed verdict against Lawlor on her claim for commissions under the "procuring cause" doctrine; and several rulings of the trial court in the event we grant North American's request for a new trial.

ANALYSIS OF NORTH AMERICAN'S APPEAL

North American first contends that the circuit court erred in denying its motion for a directed verdict, its motion for judgment *n.o.v.*, and its motion for a new trial on Lawlor's intrusion claim because there was no evidence to support the imposition of vicarious liability upon North American. Lawlor responds that there are three bases to impose liability against North American: (1) North American's direct involvement in the pretexting; (2) North American's ratification of the pretexting; or (3) North American's liability for the acts of its agent, Probe, and

its subagent Discover.

We apply the *de novo* standard in reviewing the circuit court's denial of a directed verdict and its denial of a motion for judgment *n.o.v. Buckholtz v. MacNeal Hospital*, 337 Ill. App. 3d 163, 167 (2003); *Diaz v. Legat Architects, Inc.*, 397 Ill. App. 3d 13, 31 (2009). " '[V]erdicts ought to be directed and judgments *n.o.v.* entered only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand.' " *Buckholtz*, 337 Ill. App. 3d at 167 (quoting *Pedrick v. Peoria & Eastern R.R. Co.,* 37 Ill. 2d 494, 510 (1967)). "A directed verdict is granted improperly where 'there is any evidence, together with reasonable inferences to be drawn therefrom, demonstrating a substantial factual dispute, or where the assessment of credibility of the witnesses or the determination regarding conflicting evidence is decisive to the outcome.' " *Kim v. Mercedes-Benz, U.S.A., Inc.*, 353 Ill. App. 3d 444, 460 (2004) (quoting *Maple v. Gustafson,* 151 Ill. 2d 445, 454 (1992)). "[A] motion for judgment notwithstanding the verdict presents a question of whether, considering the evidence and all reasonable inferences in the light most favorable to the plaintiff, there is a total failure or lack of evidence to prove any element of the plaintiff's case." *Spiegelman v. Victory Memorial Hospital*, 392 Ill. App. 3d 826, 841 (2009).

We review the trial court's decision on a motion for a new trial for an abuse of discretion. *Buckholtz*, 337 Ill. App. 3d at 167. "If the trial judge, in the exercise of his discretion, finds that the verdict is against the manifest weight of the evidence, he should grant a new trial; on the other

hand, where there is sufficient evidence to support the verdict of the jury, it constitutes an abuse of discretion for the trial court to grant a motion for a new trial." *Maple v. Gustafson*, 151 Ill. 2d 445, 456 (1992).

If an agency relationship existed, North American can be held liable for Probe's tortious conduct under the doctrine of *respondeat superior*, if the tort was committed within the scope of the agent's agency. *Krickl v. Girl Scouts, Illinois Crossroads Council, Inc.*, 402 Ill. App. 3d 1, 4 (2010). "Although the existence of an agency relationship usually is a question of fact, it is an issue of law where the facts relating to the relationship are undisputed or no liability exists as a matter of law." *Krickl*, 402 Ill. App. 3d at 5. "[T]he existence and extent of an agency relationship may be established by circumstantial evidence based upon an examination of the situation of the parties, their acts, and other relevant circumstances." *Stefani v. Baird & Warner, Inc.*, 157 Ill. App. 3d 167, 171 (1987). "When the facts relied upon to establish the existence of an agency relationship are conflicting, or conflicting inferences can be drawn from them, the question is one of fact for the jury ***." *Knauerhaze*, 361 Ill. App. 3d at 559. The existence of an agency relationship must be proved by a preponderance of the evidence. *Knauerhaze*, 361 Ill. App. 3d at 559.

The paramount consideration in determining whether an agency relationship exists is whether the alleged agent retains the right to control the manner of doing the work. *Petrovich v. Share Health Plan of Illinois, Inc.*, 188 Ill. 2d 17, 46 (1999). Courts should also consider " 'the question of the hiring, the right to discharge, the manner of direction of the servant, the right to

terminate the relationship, and the character of the supervision of the work done.' " *Petrovich*, 188 Ill. 2d at 46 (quoting *Merlo v. Public Service Co. of Northern Illinois,* 381 Ill. 300, 319 (1942)). However, these factors "merely serve as guides to resolving the primary question of whether the alleged agent is truly an independent contractor or is subject to control." *Petrovich*, 188 Ill. 2d at 47.

Initially, we should note that North American's theory at trial and argument on appeal are inconsistent with its own judicial admission on the agency issue. In North American's "Opposition to Lawlor's Supplement to her Motion to Enforce Probe's Subpoena and Motion to Quash Subpoenas for Telephone Records," counsel for North American stated that both Probe and Discover were "agents of North American's attorney that had been retained to investigate Lawlor's employment activities while employed by North American." This filing was supported by an affidavit of North American's attorney, Greenblatt, averring that "Probe performed investigatory services, as my agent and at my direction, concerning the circumstances of Lawlor's employment at North American."

Judicial admissions are formal admissions in the pleadings that have the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact. *Konstant Products, Inc. v. Liberty Mutual Fire Ins. Co.*, 401 Ill. App. 3d 83, 86 (2010). Our supreme court defines judicial admissions as "deliberate, clear, unequivocal statements by a party about a concrete fact within that party's knowledge." *Roti v. Roti*, 364 Ill. App. 3d 191, 200, 845 N.E.2d 892, 900 (2006) (quoting *In re Estate of Rennick*, 181 Ill. 2d 395, 406-07 (1998)). An admission

in an unverified pleading signed by an attorney is binding on the party as a judicial admission. *Knauerhaze v. Nelson*, 361 Ill. App. 3d 538, 558 (2005). "Where made, a judicial admission may not be contradicted in a motion for summary judgment [citation] or at trial [citation]. The purpose of the rule is to remove the temptation to commit perjury." *Roti*, 364 Ill. App. 3d at 200 (quoting *In re Estate of Rennick*, 181 Ill. 2d at 406-07).

First, corporate counsel for North American, Greenblatt, averred that Probe was an agent at the direction of North American. Second, litigation counsel for North American averred that both Probe and Discover were agents of North American and incorporated Greenblatt's affidavit into North American's Opposition to Lawlor's Supplement to her Motion to Enforce Probe's Subpoena and Motion to Quash Subpoenas for Telephone Records. North American is bound by the judicial admissions of its counsel. Thus, North American's admission that Probe and Discover were agents was sufficient to establish that Probe and Discover were acting as North American's agents.

Notwithstanding this admission, the evidence adduced at trial is more than sufficient to support the jury's findings that: Probe was acting as North American's agent when Probe got information about Lawlor's phone calls from Discover, which was obtained through pretexting; North American knew Discover obtained information about Lawlor's phone calls through pretexting; and North American authorized Probe or Discover to obtain information about Lawlor's phone calls through pretexting.

The jury heard testimony about the critical interaction of North American employees with

the investigative entity that eventually obtained the phone records, which was central to Lawlor's claim against North American. First and foremost, DiLuigi, the president and apparently the sole employee of Probe, testified that Dolan instructed him to get Lawlor's phone records. This is surely consistent with a principal exercising its control over its agent, by giving specific information to obtain private phone records. Dolan, who was the vice president of operations at North American, testified that he corresponded with DiLuigi directly. It was Dolan who provided the information about Lawlor to Probe, including Lawlor's name, address, social security number, birthday, and cell phone and home phone numbers, that enabled Probe to obtain Lawlor's phone logs.

Dolan also testified that DiLuigi told him that he typically obtained the phone logs of other persons in similar investigations where there was a concern about competition. Dolan claimed to be unaware of what Probe was going to do with this information, but admitted he was not surprised when he received Lawlor's phone logs. The evidence also indicates that North American received at least five faxes from Probe with information about Lawlor's phone records. These records contained more than 700 handwritten entries with information about what number was called, the time of the call and the length of the call. At no point did Dolan tell DiLuigi to stop sending him faxes. When asked why he did not ask how Probe obtained Lawlor's phone records, Dolan testifed that he "relied on Mr. Greenblatt and Mr. DiLuigi in performing the procedures in the investigation." After receiving the phone logs, Dolan personally researched the phone numbers on the logs through internet searches and consulted with other North American

executives to follow-up on who the numbers belonged to.

Van Paris similarly testified that he received faxes of phone numbers from Probe that he assumed were Lawlor's, looked at the numbers to see if any of them looked familiar to him, and researched the phone numbers on the Internet. In another remarkable bit of testimony that establishes that North American exercised control over its agent investigator, its president, Miller, testified that Dolan had the authority to give Lawlor's personal information from the North American employee file to Probe so that Probe could use that information to get Lawlor's personal phone records. Miller said he never even considered whether it was proper to use Lawlor's personal information to get her phone records. Miller also never instructed Dolan to not obtain the phone records because Miller assumed that North American wanted to get phone records. This testimony is entirely consistent with the jury's verdicts and its answers to special interrogatories.

Additionally, Greenblatt instructed Probe to contact North American and did not give Probe any other directions. Probe never sent Greenblatt documents that it had obtained as a result of the Lawlor investigation. Greenblatt did not limit what Probe could do as part of the investigation and did not call to get updates on the investigation. Greenblatt testified that the Lawlor investigation was for the benefit of North American.

On the other hand, North American primarily relies on evidence that it was unaware of how Probe obtained Lawlor's phone records. North American also points to Dolan's testimony that he never instructed Greenblatt how to conduct the investigation, and North American never

paid Probe directly for any of the investigative work. Rather, Dolan signed off on two payments, $15,000 and $22,994.88, to Greenblatt's law firm, which were then forwarded to Probe. Greenblatt testified that he billed little, if any, time regarding this investigation.

Because North American did present contrary evidence as to the existence of an agency relationship, the trial court properly submitted this issue to the jury. After carefully reviewing the evidence in the light most favorable to Lawlor, it cannot be said that the evidence so overwhelmingly favors North American that no contrary verdict based on that evidence could ever stand. North American's defense as presented to the jury and to this court on appeal was essentially one of plausible deniability, with North American claiming that its supervisors were unaware of what its lawyer's investigator was doing. It is also obvious that North American was quite willing to work with the investigator's ill-gotten gain. The jury appears to have not believed some of the claims of North American's officers and employees while having been persuaded by the plentiful evidence to the contrary, much of which was referenced above. Finally, the jury's answers to special interrogatories, drafted by North American, are entirely consistent with active participation on defendant's part and a finding of a principal/agent relationship between defendant and the investigators.

We will not substitute our judgment for the jury's nor reweigh the evidence. We conclude that Lawlor effectively proved that Probe was North American's agent and that North American exercised sufficient control over its agent in the process of invading Lawlor's privacy over the course of some five months. Accordingly, the circuit court did not err in denying North

American's motion for a directed verdict and its motion for judgment *n.o.v.* on Lawlor's intrusion claim.

With regard to the trial court's denial of North American's motion for a new trial, for the reasons delineated above, we hold that the trial court did not abuse its discretion in denying this motion because the jury's verdict was not against the manifest weight of the evidence.

North American's next contention concerns the punitive damages awarded to Lawlor on her intrusion claim. The jury returned a verdict of $1,750,000. North American argues that there was no evidence to support a verdict of any punitive damages, and that the verdict in this case violates Illinois common law and constitutional principles. Lawlor responds that the entry of punitive damages against North American was proper because North American essentially directed Probe to commit the tortious conduct. In the alternative, Lawlor argues that punitive damages were proper because the jury found North American authorized Probe or Discover to obtain information about Lawlor's telephone logs through pretexting, causing actual injury to Lawlor, satisfying the requirements under the theory of corporate complicity. In her cross-appeal, Lawlor also requests that we reinstate the jury's original award of $1.75 million in punitive damages.

We utilize a three-step approach in reviewing a trial court's decision to award punitive damages, considering: " '(1) whether punitive damages are available for the particular cause of action, using a *de novo* standard; (2) whether, under a manifest weight of the evidence standard, the defendant or defendants acted fraudulently, maliciously or in a manner that warrants such

damages; and (3) whether the trial court abused its discretion in imposing punitive damages.' " *Dubey v. Public Storage, Inc.*, 395 Ill. App. 3d 342, 355 (2009) (quoting *Caparos v. Morton,* 364 Ill. App. 3d 159, 178 (2006)).

Under the first consideration, neither party claims that punitive damages are unavailable for an unreasonable intrusion upon seclusion cause of action. Our research has disclosed no reason why punitive damages would be unavailable for such a cause. See *Slovinski v. Elliott*, 237 Ill. 2d 51, 58 (2010) ("[p]unitive damages may be awarded when the defendant's tortious conduct evinces a high degree of moral culpability"). We thus turn to the second consideration.

Under the second consideration, "punitive damages may be awarded when torts are committed with 'fraud, actual malice, deliberate violence or oppression, or when the defendant acts willfully, or with such gross negligence as to indicate a wanton disregard of the rights of others.' " *Kennan v. Checker Taxi Co.*, 250 Ill. App. 3d 155, 160 (1993) (quoting *Kelsay v. Motorola, Inc.*, 74 Ill. 2d 172, 186 (1978)). "Punitive damages are not awarded as compensation, but serve instead to punish the offender and to deter that party and others from committing similar acts of wrongdoing in the future." *Kennan*, 250 Ill. App. 3d at 160. "To determine whether punitive damages are appropriate, 'the trier of fact can properly consider the character of the defendant's act, the nature and extent of the harm to the plaintiff that the defendant caused or intended to cause and the wealth of the defendant.' " *Slovinski*, 237 Ill. 2d at 58 (quoting Restatement (Second) of Torts §908(2) (1979)). "Because punitive damages are penal in nature, they 'are not favored in the law, and the courts must take caution to see that punitive damages are

27

not improperly or unwisely awarded.' " *Slovinski*, 237 Ill. 2d at 58 (quoting *Kelsay,* 74 Ill.2d at 188).

"When the liability of a corporate defendant is predicated upon a theory of *respondeat superior*, the imposition of punitive damages is narrowly circumscribed." *Kennan*, 250 Ill. App. 3d at 160. In *Mattyasovszky v. West Town's Bus Co.*, 61 Ill. 2d 31, 36-37 (1975), our supreme court adopted section 217C the Restatement (Second) of Agency (1958) and stated that punitive damages can be awarded against a principal for the act of an agent if: (1) the principal authorized the doing and the manner of the act, or (b) the agent was unfit and the principal was reckless in employing him, or (c) the agent was employed in a managerial capacity and was acting in the scope of his employment, or (d) the principal or a managerial agent of the principal ratified or approved the act.

Here, as we have detailed above, Lawlor proffered sufficient evidence for the jury to conclude that North American authorized Probe to obtain her private phone records and did not seek to put any limits on its methods in doing so. In sum, this evidence suggests that Lawlor's records were obtained on a number of occasions, and that North American acted willfully in disregarding Lawlor's rights by accepting the phone records sent to it by Probe and by using the fruits of this improper investigation by conducting its own research while utilizing the phone logs. Accordingly, it was not against the manifest weight of the evidence for the trial court to allow the jury to consider punitive damages. The court also heard evidence in an offer of proof that established that North American instituted at least two similar investigations for employee phone

records. Even though the trial court prevented the jury from hearing that evidence, it is relevant to our review of the appropriateness of submitting the issue of punitive damages to the jury.

Under the third consideration, we must determine whether the trial court abused its discretion in assessing punitive damages. "A trial court does not abuse its discretion unless no reasonable person could assume its view." *Dubey*, 395 Ill. App. 3d at 356. We conclude the evidence detailed above is more than sufficient for a reasonable person to find Lawlor deserved an award of punitive damages, and the trial court, therefore, did not abuse its discretion in allowing the jury to consider punitive damages.

Next, North American contends that the amount of punitive damages awarded was excessive. Lawlor, meanwhile, urges this court to reinstate the full amount of the punitive damage award, arguing, *inter alia*, that the court's analysis was faulty and that it failed to take into account that Lawlor had incurred over $600,000 in legal fees and that she must pay a contingency fee to the lawyers who took her cause to trial. Section 2–1207 of the Code of Civil Procedure (735 ILCS 5/2-1207 (West 2004)) provides that the "trial court may, in its discretion, with respect to punitive damages, determine whether a jury award for punitive damages is excessive, and if so, enter a remittitur and a conditional new trial." When a circuit court reduces a jury's punitive damage award by remittitur, we review the court's decision for an abuse of discretion. *Slovinski*, 237 Ill. 2d at 58. We will now consider if the jury's verdict was excessive or whether the court abused its discretion in remitting the verdict by $1.1 million.

To determine if an award is excessive, we look to "a fact-specific set of relevant

circumstances including: '(1) the nature and enormity of the wrong, (2) the financial status of the defendant, and (3) the potential liability of the defendant.' [Citation.]" *Dubey*, 395 Ill. App. 3d at 358. " 'The highly factual nature of the assessment of punitive damages dictates that a great amount of deference should be afforded the determination made at the trial court level, and to reflect that deference and the highly factual nature of the determination, we review the assessment of punitive damages on a manifest-weight-of-the-evidence standard.' " *Dubey*, 395 Ill. App. 3d at 358 (quoting *Turner v. Firstar Bank, N.A.*, 363 Ill. App. 3d 1150, 1161-62 (2006)). " 'A judge or jury's assessment of punitive damages will not be reversed unless the manifest weight of the evidence shows that the assessment was so excessive as to demonstrate passion, partiality, or corruption on the part of the decision-maker.' " *Dubey*, 395 Ill. App. 3d at 358 (quoting *Franz v. Calaco Development Corp.,* 352 Ill. App. 3d 1129, 1145 (2004)).

Here, we conclude that the jury's award of $1.75 million was reasonable given North American's reprehensible conduct. The nature and the inappropriateness of the intrusive conduct in meddling with plaintiff's personal records was sufficiently malevolent to warrant punitive damages, especially considering that North American on multiple occasions, over a five-month period, specifically utilized the wrongfully obtained phone records. While several of its officers and employees testified that they were unaware of the methodology of how the records were obtained and whether unethical or illegal means were utilized, North American points to no evidence showing it was uncomfortable with the receipt or the use of this private information. To the contrary, North American employees testified that they had no hesitancy in using the phone

records and that they never inquired how they were obtained. In terms of the size of the award, the jury heard that North American's net worth was approximately $50 million. It can scarcely be argued that the amount awarded by the jury was egregiously high, given both the nature of the conduct and the extent of defendant's net worth.

We further find that the trial court abused its discretion in reducing the jury's verdict. "Juries have the unique ability to 'articulate community values' and evaluate 'the reprehensibility of a defendant's conduct for the purposes of awarding punitive damages.' " *Blount v. Stroud*, 395 Ill. App. 3d 8, 23 (2009) (quoting *Franz v. Calaco Development Corp.*, 352 Ill. App. 3d 1129, 1144 (2004)), *appeal denied*, 235 Ill. 2d 585 (2010), and *cert. denied*, __ U.S. __, 131 S. Ct. 503 (2010). Here, the court simply reduced the verdict to an amount that represented 10 times the amount of compensatory damages. "[U]nder the Illinois common law analysis, there is no requirement that the amount of punitive damages imposed on a defendant bear any particular proportion to the size of the plaintiff's compensatory recovery." *Blount*, 395 Ill. App. 3d at 23. In our view, the trial court failed to take into account the fact that Lawlor has incurred more than $600,000 in attorney fees in her effort to correct North American's invasion of her privacy. Our supreme court has held that it is appropriate for a court to consider the amount of attorney fees expended when assessing the propriety of punitive damages. *International Union Operating Engineers, Local 150 v. Lowe Excavating Co.*, 225 Ill. 2d 456, 490 (2006). Reducing Lawlor's punitive damage award to $650,000 would essentially guarantee that only her lawyers would be compensated. North American would be essentially emboldened to continue its behavior with

other employees, comfortable in the knowledge that it could use its superior position and enormous wealth to discourage any employee from taking legal action against it for this sort of conduct. Thus, the remittitur was an abuse of the trial court's discretion.

Next, we apply the *de novo* standard in reviewing North American's alternative contention that the amount of damages assessed against it were unconstitutional. *Dubey*, 395 Ill. App. 3d at 359. We consider three constitutional guideposts as we review awards of punitive damages: "'(1) the degree of the reprehensibility of the defendant's misconduct, (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award, and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases.' " *Dubey*, 395 Ill. App. 3d at 359 (quoting *Turner,* 363 Ill. App. 3d at 1162-63).

To determine reprehensibility, reviewing courts consider: " '(1) whether the harm caused was physical as opposed to economic, (2) whether the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others, (3) whether the target of the conduct had financial vulnerability, (4) whether the conduct involved repeated actions or was an isolated incident, and (5) whether the harm was the result of intentional malice, trickery, deceit, or mere accident.' " *Dubey*, 395 Ill. App. 3d at 359 (quoting *Turner v. Firstar Bank, N.A.*, 363 Ill. App. 3d 1150, 1163 (2006)). Here, Lawlor presented evidence that she sustained physical injuries as a result of North American's conduct, including vomiting, sleeplessness, fear, and anxiety. North American's conduct involved ordering private phone records without consent through

32

surreptitious and unethical means. North American did this over a period of five months and repeated the process with at least two other employees. Additionally, North American intentionally utilized Lawlor's records and made no attempt to prevent Probe from obtaining those records. At trial and on appeal, North American still ardently maintains that it did absolutely nothing wrong in this regard and contends that it has no responsibility for the conduct of its employees in utilizing those records, not to mention the investigators who obtained them through pretexting. Based on this evidence, Lawlor established a sufficient degree of reprehensibility on the part of North American because there was evidence of intentional malice, trickery and deceitful conduct by it and its agents.

Under the second guidepost the Supreme Court has stated that "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *State Farm Mutual Automobile Insurance Co. v. Campbell,* 538 U.S. 408, 425 (2003). "On the other hand, ratios greater than those may comport with due process if a particularly egregious act has resulted in only a small amount of economic damages." *Dubey*, 395 Ill. App. 3d at 359 (citing *Turner*, 363 Ill. App. 3d at 1164). In this case, the compensatory damages were $65,000 and plaintiff has incurred more than $600,000 in legal fees to acquire justice for the invasion of her privacy. The trial court failed to take the legal fees incurred by plaintiff into account, which ignores the burden that plaintiff had to bear in order to bring this matter before a jury. When the fees are considered, the ratio is less than 3 to 1, which satisfies any critical examination of Illinois and Supreme Court case law on this subject. See *Blount*, 395

Ill. App. 3d at 29 (court noted that the combination of compensatory damages and attorney fees reduced the punitive vs. compensatory ratio from 10 to 1 to 2 to 1); see also *International Union*, 225 Ill. 2d at 490.

The third guidepost is the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases. Illinois and federal law now both mandate that pretexting to obtain phone records is a felony punishable by jail time and civil penalties. See 720 ILCS 5/16G–15(a)(7) (West 2008); 18 U.S.C. §1039(a) (West 2006). While this legislation was not in effect at the time of North American's conduct in this case, it sheds light on the gravity of the offense.

Applying the three guideposts, we conclude that the jury's award of $1.75 million in punitive damages was not unconstitutional.

### ANALYSIS OF LAWLOR'S CROSS-APPEAL

We now turn to the issues raised in Lawlor's cross-appeal. As mentioned above, the trial court conducted a contemporaneous bench trial on North American's counterclaim, since it sounded in equity. One month after the jury had returned its verdicts on Lawlor's claim, the trial court heard oral arguments of counsel and then returned its findings, orally and in memorandum form, finding that Lawlor breached her fiduciary duty to North American by sending Christenson at Shamrock a letter containing North American's confidential, proprietary information and by attempting to steer MapQuest's business (albeit unsuccessfully) from North American to Shamrock. The circuit court entered judgment against Lawlor, awarding North American

$78,781 in compensatory damages (for repayment of compensation earned while allegedly in breach of her duty of loyalty) and $551,467 in punitive damages, totaling $630,248.

We review a trial court's decision following a bench trial to determine if the judgment is against the manifest weight of the evidence. *Gambino v. Boulevard Mortage Corp.*, 398 Ill. App. 3d 21, 51 (2009). A judgment is not against the manifest weight of the of the evidence unless the opposite conclusion is clearly evident. *Gambino*, 398 Ill. App. 3d at 51. As the trier of fact, the trial judge was in the best position to judge the credibility of witnesses. *Chicago's Pizza, Inc. v. Chicago's Pizza Franchise Ltd. USA*, 384 Ill. App. 3d 849, 859 (2008). "When contradictory testimony that could support conflicting conclusions is given at a bench trial, an appellate court will not disturb the trial court's findings based on that testimony unless a contrary finding is clearly apparent." *Chicago's Pizza*, 384 Ill. App. 3d at 859.

Lawlor's central contention in this regard is that the trial court erred in finding any breach of fiduciary duty of loyalty because she was an at-will employee without evidence that she violated a noncompetition agreement or other restrictive covenant that would prohibit the disclosure of any information (save trade secrets) to a prospective employer. She further argues that there was no evidence that she brought a single client from North American to Shamrock and that any contacts related to attempting to do so were in no way improper.

"To state a cause of action for breach of fiduciary duty, a plaintiff must allege and ultimately prove (1) a fiduciary duty on the part of the [employee], (2) a breach of that duty, (3) an injury, and (4) a proximate cause between the breach and the injury." *Alpha School Bus Co. v.*

35

*Wagner*, 391 Ill. App. 3d 722, 747 (2009). Stated broadly, Illinois recognizes that an employee can be liable for breach of fiduciary duty to her employer when she discloses confidential business information to a competitor while still employed by her employer. *Veco Corp. v. Babcock*, 243 Ill. App. 3d 153, 160 (1993). Furthermore, an employee who attempts to solicit her employer's customers for herself or a competing entity can be in breach of her fiduciary duty to her employer. *ABC Trans National Transportation, Inc. v. Aeronautics Forwarders, Inc.*, 62 Ill. App. 3d 671, 683 (1978). However, "absent fraud, a contractual restrictive covenant, or the improper taking of a customer list, former employees may compete with their former employers and solicit former customers provided there was no demonstrable business activity before termination of their employment." *Alpha School Bus*, 391 Ill. App. 3d at 736; *Cooper Linse Hallman Capital Management, Inc. v. Hallman*, 368 Ill. App. 3d 353, 355-56 (2006). "While an enforceable restrictive covenant may protect material which does not constitute a trade secret, an employer's protection absent a restrictive covenant is narrower and extends only to trade secrets [citation], or near-permanent customer relationships." *Cincinnati Tool Steel Co. v. Breed*, 136 Ill. App. 3d 267, 274 (1985).

Based upon our review of the record, the trial court's conclusion that Lawlor breached her fiduciary duty of loyalty to North American mostly rests upon (1) an unproven assertion that she unsuccessfully attempted to steer the MapQuest business from North American to Shamrock before she moved over to that company, and (2) testimony that Lawlor's letter to Christenesen contained North American's confidential sales and profit information.

First, on the subject of the alleged diversion of business, there is no proof that MapQuest

36

or any other North American client followed Lawlor to Shamrock or that she cost her employer the loss of any business whatsoever. The only evidence that touched on business diversion came in the Bristow affidavit, which was admissible only for impeachment purposes. Other than this affidavit, North American points to testimony that Bristow called North American, volunteered information about Lawlor's behavior to Perez and Van Paris, and set up an appointment with North American to further discuss her improper actions. North American claims that as a result of this, it initiated the noncompetition investigation to determine whether it was going to lose business as a result of Lawlor's actions. Ultimately, of course, the evidence revealed that North American did not lose any business.

Next, regarding Lawlor's letter to Christensen, our reading of this document reveals a rather bland recitation of an at-will employee's business-getting abilities and an effort to market herself to a potential employer. Other than Perez's testimony that he considered the information in Lawlor's letter to be confidential, there was no competent evidence that the information was in fact confidential and no evidence that any sort of trade secret was disclosed. See *Veco*, 243 Ill. App. 3d at 163 (holding that there was no breach of fiduciary duties where defendants submitted no evidence that certain documents were confidential). Furthermore, at oral argument before this court, counsel for North American conceded that the document in question was "not, in any legal sense, confidential." Lawlor also points to the letter from North American's chief financial officer, Egan, which contained detailed information regarding specific profit margins, costs, and pricing figures on a per customer basis. The material was sent to bolster North American's claim

that Lawlor owed it $20,000, but defendant did not in any way indicate that the information contained in the lengthy document was confidential.

Contrary to the tenor of some of the arguments presented by North American on appeal, the jury and trial judge heard no evidence that Lawlor was subject to any form of a noncompetition agreement or any sort of a restrictive covenant that would prohibit any of the activities that form the gravamen of its breach of loyalty counterclaim. Defendants pointedly did not include the noncompetition agreement in the pleading of its counterclaim that served as the vehicle for the trial court's verdicts. As mentioned early in this opinion, North American did not attempt in any way to utilize its noncompetition agreement at trial.

North American has not cited, and our researched has not disclosed, any Illinois decision where an at-will employee was held liable for breaching the duty of loyalty for disclosing information unless the information was used to compete against the employer prior to termination. Indeed, the trial court's memorandum on this issue similarly did not cite a case that was factually or legally on point. Its citation of *ABC Trans National Transport, Inc. v. Aeronautics Forwarders, Inc.*, 90 Ill. App. 3d 817, 825 (1980), *Veco*, and *Corroon & Black of Illinois, Inc. v. Magner*, 145 Ill. App. 3d 151 (1986), is inapposite because they are factually and legally distinguishable from the present dispute.

In *ABC Trans National*, the defendants were key management employees of the plaintiff corporation who actively promoted the interests of a competing firm and diverted plaintiff's personnel and customers to the competing firm while still employed at the plaintiff corporation.

*ABC Trans National*, 90 Ill. App. 3d at 825. More than half of plaintiff's business was lost to the competing firm immediately thereafter. *ABC Trans National*, 90 Ill. App. 3d at 820. The appellate court found the defendants breached their duty of loyalty, persuaded by the "potentially crippling loss of half of its business and major customers, as well as substantial numbers of its personnel" caused be the "defendants' well-organized plan and their conduct in furtherance of the plan before they departed from [the plaintiff corporation]." *ABC Trans National*, 90 Ill. App. 3d at 825. Again, defendant cannot point to the loss of a single account as a result of Lawlor's conduct.

Similarly, in *Veco*, the defendants were both high-ranking officers of the plaintiff corporation. *Veco*, 243 Ill. App. 3d at 155. It was undisputed that one of the defendants solicited business for his newly formed corporation while still employed at the plaintiff corporation. *Veco*, 243 Ill. App. 3d at 161. Because the defendants were officers, the appellate court found that they breached their fiduciary duty by actively exploiting "their fiduciary positions to enhance their individual interests at the expense of their employer." *Veco*, 243 Ill. App. 3d at 162. Thus, in both *ABC Trans National* and *Veco*, the defendants were not mere employees, but were corporate officers who owed a heightened fiduciary duty to their employer. See *Veco*, 243 Ill. App. 3d at 160-61 (corporate officers owe a fiduciary duty of loyalty to their corporate employer not to (1) actively exploit their positions within the corporation for their own personal benefit, or (2) hinder the ability of a corporation to continue the business for which it was developed).

Finally, in *Corroon & Black*, the appellate court reversed the trial court's order granting

the defendants' motion for summary judgment because there was some evidence which tended to show that the defendants caused the plaintiff corporation to lose an account while still in plaintiff's employ. *Corroon & Black*, 145 Ill. App. 3d at 161. Also, the defendant-employee in that case signed the corporation's standard employment agreement containing a restrictive covenant. *Corroon & Black*, 145 Ill. App. 3d at 157.

In sum, there was no proof of diverting business while Lawlor was at North American and no proof that any was diverted once she got to Shamrock. Similarly, there was simply no evidence admitted of any contractually imposed duty on Lawlor's part to refrain from disclosing any sales or profit information to any competitors at any time. As a result, the trial court's judgments in North American's favor were against the manifest weight of the evidence and must be vacated.

As a final matter, Lawlor contends that the trial court erred in granting North American's motion for a directed verdict on her procuring cause claim. In count II of Lawlor's third amended complaint, she alleged she was entitled to commissions relating to sales made to MapQuest, FTD, Pliant, and Komatsu under the procuring cause doctrine. The trial court granted North American's motion for directed verdict on this claim and limited Lawlor to proceeding on a breach of contract claim for compensation earned prior to the end of her employment. "Under the procuring-cause rule, a party may be entitled to commissions on sales made after the termination of a contract if that party procured the sales through its activities prior to termination." *Scheduling Corp. of America v. Massello*, 151 Ill. App. 3d 565, 568 (1987). "The rule applies,

however, only if the contract does not expressly provide when commissions will be paid." *Scheduling Corp.*, 151 Ill. App. 3d at 568. As previously mentioned, we apply the *de novo* standard in reviewing the circuit court's denial of a directed verdict.

Lawlor testifed that in June 2005, she received a sales compensation policy before her departure from North American. The compensation policy provided, in pertinent part, that sales employees would not receive commission after their termination date. Lawlor also testifed to signing a "true-up" agreement in 2002, meaning if her draw was greater than the commissions she had earned for the year in which she left the company, she would have to pay the difference to North American when she left. This agreement was silent as to whether Lawlor could receive additional commissions after she left. Finally, Lawlor was aware of North American's long-standing policy that employees were not entitled to commissions after they left the company. Lawlor stated that she was entitled to a 30% commission on all Komatsu sales after her colleague Hall left the company, whom she previously split the commission with. In light of this evidence, we conclude that there was an agreement in place at the time of Lawlor's separation from North American that expressly provided when commissions would be paid. Accordingly, the trial court did not err in granting North American's directed verdict on Lawlor's procuring cause claim.

CONCLUSION

For the foregoing reasons, we affirm the trial court with respect to the verdicts received by Lawlor and reinstate the jury's original award of $1.75 million in punitive damages. We reverse the circuit court's judgment against Lawlor on North American's counterclaim regarding an

41

alleged breach of fiduciary duty and vacate the compensatory and punitive damages awarded to North American in that claim. We affirm the trial court's directed verdict on Lawlor's procuring cause claim.

Affirmed in part and reversed in part.